This suit against the State of Louisiana was authorized by Act 252 of 1946.
It is one for damages to an automobile ambulance arising out of an accident which happened on the afternoon of August 10, 1945, on U.S. Highway No. 171 on the approach to the bridge which crosses Calcasieu River about four miles north of Lake Charles, and known as Moss Bluff Bridge. The claim is restricted to repairs that were made necessary to the ambulance amounting to the sum of $321.03. The amount is not disputed.
The owners of the ambulance, plaintiff's in this suit, are the proprietors of Hixson Funeral Home, a partnership composed of several parties, one of whom resides in the Parish of Beauregard and the others being all residents of the Parish of Calcasieu.
They allege in their petition that on the date mentioned, the ambulance was proceeding in a northerly direction on its way from St. Patrick Hospital in Lake Charles, to deliver a patient to her home in Beauregard Parish, and that on approaching the bridge referred to, whilst the driver of the ambulance was proceeding in a careful manner, with the patient and her husband in the rear part and a guest sitting on the front seat next to him, all of a sudden, without any warning or notice of any kind, a gate, being the *Page 755 
gate on the south end of said bridge, which was used to stop traffic when the bridge is to be opened, was lowered immediately in front of and upon the ambulance, striking the top thereof and then scraping along the hood, into the windshield and then over the top, before dropping on the bridge floor, causing the damage which is sought to be recovered. It is further alleged that the driver of the ambulance was not aware that the bridge was about to be opened or the gate lowered; that he was approximately ten feet from the gate when it appeared visible to him and he was therefore unable to stop the ambulance and avoid the resulting collision.
Plaintiffs described the type of bridge that spans the river at that point and the construction of the gate used to stop traffic over it when the bridge is being opened or closed. All operations involved in opening the bridge and lowering the gate have to be done by a bridge tender who is employed by the Department of Highways of the State of Louisiana, which has full control over the same. Plaintiffs then allege that it is the duty of the bridge tender to operate the opening and closing of the said bridge and the lowering of the gates in such a prudent manner as not to create a hazard to the travelling public but that on the day of this accident he operated the same negligently and without due care and proper regard for the welfare and safety of the people going over the bridge, his negligence consisting in the following: (1) In not sounding the siren on the bridge which was there to be used for a warning that the gates on the bridge were about to be lowered; (2) In failing to look for approaching traffic before lowering the gates and in this particular instance in failing to see that the ambulance would be unavoidably struck by lowering it at the moment he did, and (3) In lowering it at a moment when the ambulance was approximately under the gate itself, within his clear vision.
The defense to the suit may be said to be a denial of the acts of negligence charged against the bridge tender and a direct charge that to the contrary the accident was caused solely by the negligence and carelessness of the driver of the ambulance who drove the same into and caused it to collide with the gate after the gate had been lowered and was already in its proper position. It is averred that the gate was clearly visible to any one who might be looking toward it and that the driver of the ambulance either saw it or should have seen it when it was so lowered in time to stop before colliding with it.
It is further alleged that the siren on the bridge was sounded loudly and long prior to the lowering of the gate and that the tender had otherwise complied with all of his duties in regard to opening the said bridge, especially in lowering the gate on the south end, into which the ambulance drove. In the alternative defendant pleads that should there be negligence found on the part of the bridge tender in any way, which is denied, then the negligence as set out against the driver of the ambulance constituted contributory negligence on his part which bars recovery by his employers, plaintiffs herein.
The case went to trial on the issues as thus presented before it in the district court and resulted in a judgment in favor of the plaintiffs in the amount prayed for, together with legal interest from date of judicial demand until paid, and all costs of suit. From that judgment the defendant has taken this appeal.
There were three witnesses who testified with regard to the manner in which the accident happened. These were the driver of the ambulance, Wade Malone, the guest who occupied the seat next to him, Trillie Doyle and the bridge tender, Tom McMullen. The first two naturally were in a position to see exactly how the accident happened. The bridge tender does not claim to have seen it as he insists that he had already lowered the gate in position and was on his way to the north end of the bridge to lower the gate on that end at the moment of the collision.
Malone and Doyle both testified most positively that the gate was not lowered and that when they first saw it was when it was about to strike the ornament on top of the hood of the ambulance as it was being lowered. McMullen on the other hand claims that it was already lowered and *Page 756 
in position and that for the accident to have happened it was necessary for the ambulance to have run into it.
No reason appears why the testimony of McMullen should be accepted over that of the other two witnesses when it is all considered from a standpoint of credibility and veracity. Counsel for defendant contends that the weakness of Malone and Doyle's testimony was revealed on cross-examination when they virtually admitted that they never saw the gate at all before they say they did and the only conclusion to be drawn from that is that they were not keeping a proper look-out ahead; that even if the gate was being lowered, as they claim, they should have seen it before they say they did and the driver should then have had his ambulance under such control as to stop it before running into it.
We do not agree with counsel in this contention. We believe that these two men were truthful in saying that they never saw the gate until it was about to fall on the hood of the ambulance. The gate is manipulated by a chain hoist which is operated by hand by the bridge tender. In operating it he stands on a platform about 25 feet above the ground and in a position where he cannot be seen by approaching traffic. As we understand the manner of lowering the gate it looks as though it is almost impossible for the driver of an automobile approaching the bridge to see that it is being lowered when he is within a short distance of it. As the gate is being lowered from overhead, the approaching driver's view is naturally obstructed by the front end of the automobile top. Obviously if there was a warning or notice of some sort that the bridge is about to be opened and the gates lowered, he would be called on to take the necessary precaution to meet the situation in approaching it. But in this case it is admitted that although there was a siren on the bridge to give such warning, it was not being used at this time as there was no electrical current available to operate it with on account of the war conditions then existing. If there were any boat whistles blown nobody seems to have known anything about it and certainly there was no other signal given by the bridge tender on the ground that the gate was about to be lowered.
On the other hand it is rather hard to believe that two men approaching a bridge such as this, with a patient in an ambulance, would not be careful and that if there was a traffic gate blocking their path, at least one of them would not have seen it.
There is a stronger point however arising out of the physical facts which produces a strong abundance of proof in favor of the version of the driver of the ambulance and the guest who was with him. It is definitely shown that there was not a mark or a scratch of any kind on the front end of the ambulance and that the damage started with the front end of the hood, then followed along the top of the hood up to the windshield and then along the whole length of the top. It is impossible to conceive that if the ambulance ran into the gate that there would not have been left some marks on the radiator and grill.
But counsel for defendant has evolved a theory under which he says that that very thing could have happened. His theory is that the bumper of the ambulance struck the lower part of the gate which was suspended by the chain by which it is lowered, thus moving it forward from the bottom and throwing it over the hood and the top of the ambulance as it proceeded under it. Even so, it strikes us, there would have been some marks or dents on the front end of the radiator and that they would not have commenced, as they did on the top of the hood.
There is however another reason why we cannot agree with counsel's theory. The gate is described as being made up of boards measuring one by eight and spaced about six inches apart, the whole surface measuring four feet vertically by the full width of the road which is 18 feet. The boards are bound by an iron railing placed around them and the whole thing weighs 150 lbs. When it is lowered it sets on the curbing along each side of the road, about six inches from the level of the road itself. When it is in this position we are thus presented with an object four by eighteen feet, six inches from the ground, giving *Page 757 
the total height from the ground of four and one-half feet. It weighs 150 pounds and is suspended by what must be a rather heavy chain. The testimony does not show how securely it is fastened when in position, but we hardly think that it is left swinging, if for no other reason than because of its weight resting on the curbing on each side of the road. We seriously doubt therefore that the force of an automobile, travelling 25 or 30 miles an hour, the front of which stands about four feet from the ground, when applied to an object of about the same height and of the width of one described, will throw that object into the air, clearing the front of the automobile in such a manner as plaintiff contends it might have done in this case.
[1] Regardless of any theories however as to how the accident may otherwise have occurred, we have in the record the well reasoned opinion of the trial judge who accepted the testimony of the two witnesses for the plaintiff against that of the bridge tender and we find ourselves unable to hold that in doing so he committed manifest error.
Counsel for defendant raises other points in the case and claims there were errors committed by the trial judge in allowing the plaintiff interest on the amount of the judgment and also in casting the defendant with the costs of court.
[2] The same contention that the State cannot be made to pay interest on judgments of this kind was made in three previous cases before this court. Guercio v. State, 15 So.2d 170, Lively v. State, 15 So.2d 617 and Roppollo v. State, 23 So.2d 374. We find no reason now to change the ruling made in all three that legal interest attaches on all judgments sounding in damages, ex delicto, which may be rendered in any of the Courts of this State, as provided for by Act 206 of 1916.
[3] With regard to the question of costs, counsel is undoubtedly correct as Act 135 of 1936 specifically exempts the State, as well as its political subdivisions, from the payment of court costs other than stenographer's costs for taking testimony in any judicial proceeding brought by or against the State or any of its political subdivisions. See also Makofsky v. Department of Highways, 205 La. 1029, 18 So.2d 605.
Lastly, counsel contends that the judgment is erroneous in directing that the amount awarded be paid by the Department of Highways "out of its General Highway Maintenance Fund or other funds which may be lawfully applied to the payment of said judgment." He contends that the State Constitution does not provide for any General Highway Maintenance Fund and that public funds dedicated to the construction or maintenance of highways and bridges cannot be used to pay a claim for damages resulting from an offense or quasi offense or a judgment for damages rendered on such claim.
[4, 5] We observe that Act.252 of 1946 which authorized the present suit, specifically provides under Section 5, that the amount of the judgment rendered, assuming that there would be a judgment, "shall be paid by said department (meaning the Department of Highways) out of its General Highway Maintenance Fund or any other funds which may be lawfully applied to the payment of said judgment." The judgment rendered by the district court followed the language of the statute very explicitly and if there is anything illegal or unconstitutional in the method directing its payment, the fault is to be attributed to the Legislature in enacting the statute and not to the Court which followed its language. The Court was powerless to change any of the provisions of the Statute unless a direct attack had been made on it on some legal or constitutional ground. This was not done and it is now too late for any such question to be raised in this proceeding.
For the reasons stated, it is ordered that the judgment appealed from be amended by eliminating that part of the decree which taxed the entire costs of court against the State and by decreeing that the costs to be paid be restricted to those of the fees of the stenographer for taking the testimony in the case, and as thus amended, it is affirmed. *Page 758