KENNON, Judge.
Alleging that while a fare paying passenger in a taxicab operated by defendant he sustained permanent and serious injuries as the result of the driver’s negligence in proceeding at a high rate of speed over an uneven street intersection, plaintiff filed this suit for a total of $70,000.00 in damages. Specifically, the petition set forth that the cab driver, while proceeding easterly on St. Vincents Avenue in the City of Shreveport, Louisiana, drove into the intersection of that street with Southern Avenue at a rate of speed inconsistent with conditions at the intersection, where there was a sharp rise and a corresponding dip in the pavement; that the driver failed to-keep his car under control and failed to keep a proper lookout.
The original petition asked for the following items of damage:
Loss of earnings, past, present and future $40,000.00
Pain and suffering, past, present and future 10,000.00-
Permanent injury to back, nervous system and general impairment of health 20,000.00
By supplemental petition there was additional itemization of the medical expenses.
Defendant, in answer, admitted that plaintiff was a passenger in one of its cabs, on the date alleged, but denied the allegations covering the negligence of its driver and the existence and extent of plaintiff’s injuries.
Plaintiff requested a trial by jury and from a verdict of the jury awarding $25,-000.00 to plaintiff, defendant prosecutes the present appeal. By original and supplemental answer to the appeal, plaintiff prayed that the award be increased to $40,-310.90.
Plaintiff had been employed as a city mail carrier from 1923 until the date of his injury on December 31, 1949. On that day, after a telephone conversation with his superior at the post office, he called for a cab of the defendant company, which came to his home at 1605 Alma Street.. The cab proceeded along Alma Street to-St. Vincents Avenue and turned east toward Southern Avenue. Plaintiff’s version of the accident is contained in the following question and answer:
*672 “Q. Now tell the jury just what happened when you arrived at the intersection of St. Vincent and Southern Avenue.
“A. Well, after we had hit the railroad and just before we got to Southern Avenue the cab speeded up like he was trying to make a light or something, and he went down- — -there is a drainage, one on each side, and he went down in the first one and throwed me up a little bit and then he went down again and throwed me to the top of the cab, and right over my eye I hit something in the top of the cab, and I fell back between the seats. There is a cross part that runs down the back and I believe it went in the middle of the cab, and I was crumpled up between that.
“I thought he had killed me. I know it was at least a minute' before I could breathe. I thought the cab was turning over with me. It seemed like it was bouncing up and about to turn over. Anyway when the boy saw what he had done he tried to stop and talk to me. The driver. He tried to get me to talk to him, I couldn’t talk. So he stopped the cab right in the middle of the two-way walk where the two columns are at St. Vincent. When the door was opened the -cab was parked partly in the driveway.
“When the door was opened I was way over here and I couldn’t get up, and he pulled me up on the back seat and he kept trying to talk to me but I couldn’t answer. I thought I was dying. So he said to me, ‘Let me take you to a sanitarium,’ and I shook my head, and he tried to pick me up again and pushed with his hands.
“Then I heard him talking over the radio in to the office and he told the superintendent, T have got a passenger hurt out here. What must I do with him?’ He says, ‘Is he bad hurt?’ He said, T don’t know. He can’t talk or something.’ He said, ‘Get him up and walk him around and see if he is hurt.’ He said, T can’t.’ He said, ‘Just hold right there and I will be out there, and don’t move.’
“So then the man came out and I began to get where I could breathe and talk. He run right out in a taxicab and wheeled around. So he told me, ‘Get up.’ I said, ‘I can’t.’ He said, ‘You get hold of his shoulders and I will get hold of his feet.’ And it was just killing me. He said, ‘Don’t bother him. Take him to the sanitarium.’ I had got to- where I could talk and I said, no, I didn’t want to go to the sanitarium. He said, ‘You- had better go to the sani-. tarium. You are hurt.’ I said I didn’t want to and he said, ‘Yes, I am going to take you.’ I said I didn’t want to go but to take me home first so I could talk to my boss and my folks.”
In corroboration of his testimony that he received a severe jolt when the cab crossed Southern' Avenue, plaintiff introduced four witnesses who testified that they were riding in a pickup truck on the morning in question and happened to be following the taxicab in which plaintiff was a passenger. These witnesses testified that the cab, proceeding eastward on St. Vincents, crossed over the dips at the intersection of Southern Avenue in a manner described by one witness as causing the cab to bounce “an awful lot.” One witness stated that the back wheels of the cab -left the ground, another that he noticed that the weight was “released off the hind wheels” of the cab.
Mr. Shaw, driver of defendant’s cab in which plaintiff was a passenger, stated that he went to plaintiff’s home on the morning in question, where plaintiff entered the cab and requested to be driven to the post office in down town Shreveport. He testified that after he had turned into St. Vincents Avenue and crossed Southern, his passenger “hollered and said that his back was hurt;” that he was traveling “approximately twenty to twenty-five miles an hour” and that there was no jolt or jar of the cab as he crossed this intersection. He admitted that there was a dip on both sides of the intersection of Southern Avenue over St. Vincents Avenue, and that he was familiar with the location and crossed it -often. He testified that he endeavored to help plaintiff get out of the cab, but plaintiff stated that his back hurt him so that he couldn’t- get out and that he, by using the two-way radio, reported the situation to defendant’s office, and that Mr. O. W. Herr, an investigator for the defendant *673 company, came out to the place where the cab was parked, with Mr. Burnett still inside.
Mr. Herr, after talking with plaintiff and the driver, offered to take plaintiff to the hospital. Plaintiff requested that he first be carried home in order that he might notify his wife and employer. The cab driver took him by his home and then to the North Louisiana Sanitarium, where x-ray revealed that he had suffered a compression fracture of the twelfth dorsal vertebra. This fracture was described by one of the defense witnesses as a “minimal” fracture and by another defense witness, Dr. Paul Abramson, as a “moderate” fracture.
After plaintiff complained of his injury, the driver stopped the cab on St. Vincents Avenue a half block from Southern and remained there until after Mr. Herr arrived and concluded his conversation with the driver and plaintiff. Both the driver and Mr. Herr testified that plaintiff had said that it was not the driver’s fault. Plaintiff on the witness stand admitted that he had told the superintendent that the cab driver was not to be blamed, but in the same conversation he stated that the accident resulted when the cab driver hit the dips too fast.
Plaintiff’s testimony that he was injured by the excessive jolting of the cab as it crossed Southern Avenue is corroborated by the testimony of the four witnesses in the pickup truck, and, in addition, by the admission of the cab driver and investigator that he was obviously in pain immediately following the occurrence, and again by the medical testimony that at the time of his admission to the hospital a few minutes later he was suffering from a compression fracture of the twelfth dorsal vertebra. That this fracture was a “fresh” one is indicated by the testimony of defendant’s doctors that the x-ray made in April, 1950 showed evidence of healing of the fractured vertebra as compared with the x-ray made on December 31st upon plaintiff’s admission to the hospital immediately after the alleged injury.
We find from the record that plaintiff clearly met the burden of estab-lishing by a preponderance of the evidence that he received an injury to his back while a fare paying passenger in defendant’s cab on the date alleged. The defendant failed to establish by a preponderance of the evidence that its own cab driver was free of negligence; on the contrary, we find that the preponderance of the evidence is that its driver was guilty of negligence in proceeding across the dips at a rate of speed excessive under the conditions.
Both defendant and plaintiff made request of the trial judge for -specific charges to the jury, some of which were refused. Defendant, in this Court, has complained of the District Judge’s refusal to charge the jury that the action of the City of Shreveport in constructing the dips at the intersection in question was sufficient to charge it with notice of its defects and further that if the jury should find that the defective construction at the intersection was the sole proximate cause of the injury, defendant should not be held -liable, and further that the driver on a public street or highway generally has the right to assume that same is' in a reasonably1 safe condition and that the driver is not required to be on the lookout for defects or obstructions.
The record contains the written charge delivered to the jury by the District Judge. The charge sets forth in plain and understandable language the respective responsibilities of the plaintiff and defendant in cases in which a plaintiff seeks damages for injuries received while a passenger in a taxicab or other common carrier.
The Judge charged the jury that the burden was upon the plaintiff to prove that he was injured while a passenger in defendant’s cab and that the burden was likewise upon him to prove the extent and duration of the injury. The Court further charged the jury that once the plaintiff established the fact of his' injury, while a fare paying passenger in defendant’s cab, the burden then rested upon the defendant cab company to prove its own freedom from negligence and that this burden of proof must be discharged by a preponderance of the evidence. We find this charge *674 in accordance with the uniform jurisprudence of this state, and particularly in accord with the Supreme Court case of Cusimano v. New Orleans Public Service, Inc., 170 La. 95, 127 So. 376.
If the above described charges were relevant and not covered by the general, charge, defendant has suffered no damage for the reason that there is no evidence in the record upon which the jury could have concluded that the defective construction (if any there was) at the intersection was the sole proximate cause of the injury, and, since the defendant has failed to show its freedom from negligence by a preponderance of the evidence, it would be of no help to defendant to concede the other two points of law covered in the requested charges which were refused by the trial Court.

Quantum

At the time of his injury, plaintiff was fifty-fiv.e years of age, with a life expectancy of 17.40 years, Section 47:2405, L. S.A.-R.S. He was a mail carrier by profession. To hold his job, it was necessary that he-be able to walk his mail route carrying a mail bag which weighed up to thirty-five pounds at the beginning of his route. His earnings from the government for 1949 amounted to $3454.00. In addition, he worked during his off days as a carpenter and testified that his net earnings for 1949 on carpentry work done for a Mr. Scales amounted to $1000.00. A copy of his income tax return showed income for contracting to be $1500.00, with a deduction of $600.00 for salaries and wages and $85.00 for tools and supplies, or a net earning for contracting of $815.00. He also received a few days pay for other-carpentry work done in 1949. -
Dr. S. W. Boyce, called by plaintiff, testified that he had examined plaintiff on three occasions and had seen the x-ray report made by Dr. W. R. Harwell. He found the compression fracture of the twelfth dorsal vertebra and testified that new bone had grown in the region of the fracture extending over and onto the covering portions of the eleventh dorsal and that, in his opinion, the injury had instigated “chronic hypertrophic arthritic changes.” His opinion was that plaintiff would never again be able to carry on his occupation as a mail carrier, or do the work of a carpenter, or any other type of hard physical labor.
Plaintiff called Dr. R. A. Paine, an internal medicine practitioner, who examined plaintiff and the x-rays made by Dr. Har-well in April and May, 1950. He noted the existence of the fracture in the twelfth dorsal vertebra and testified that plaintiff was suffering from hypertrophic arthritis in both the lumbar and cervical areas. He testified that the plaintiff had suffered an injury to the nucleus pulpous, which he described as a gelatinous mass between the joints of the vertebrae which forms a cushion for the vertebrae. In his opinion, the injuries to the bone, nerves and ligaments of plaintiff’s back were such as to permanently disable him from carrying on his occupation as a mail carrier, or'doing any work except of a sedentary nature.
Another of plaintiff’s witnesses, Dr. J. M. Bodenheimer, in examinations made in April and May, 1950, found that plaintiff was suffering from the fracture of the twelfth vertebra and from an arthritic condition in both the cervical and lumbar regions, and that his pain was such as to indicate nerve injury.
He found plaintiff was suffering from high blood pressure. When asked whether he could testify as to what plaintiff’s blood pressure was in the months preceding the injury, his answer was that he could not say. At the time of his examination, plaintiff complained of pain in the hips, which indicated to Dr. Bodenheimer that there was pressure on the nerve roots in the vicinity of the fractured vertebra. He specifically suspected the nerve injury to be below the twelfth dorsal and above the first lumbar vertebra. Dr. Bodenheimer also found evidence of arthritis. He could not say how long the arthritic condition had existed, but believed that it might well have first become active following plaintiff’s injury. He stated that an x-ray of-his own back showed that he had hyper-trophic arthritis, which gave him no pain, but was of the sort that he thought would give him trouble should he receive an injury.
*675 He did not think plaintiff could resume his former occupation or do carpentry work.
Dr. Harwell testifying for plaintiff, stated that the x-rays made of plaintiff’s back revealed a compression fracture of the twelfth dorsal vertebra as well as arthritic changes, which are not uncommon. He testified that arthritis may be aggravated by trauma and that the x-ray does not show the extent of injury to the soft tissue surrounding the injured vertebra. He estimated that it would require eighteen months to two years for the healing of-the bone itself.
Dr. G. J. Woolhandler, called to the stand by defendant, testified that he made an x-ray of plaintiff’s back immediately after his admission to the North Louisiana Sanitarium on December 31st and found a minimum fracture of the twelfth dorsal vertebra; that a second x-ray made in April, 1950 showed evidence of healing.
Dr. Paul Abramson, called by defendant, described plaintiff’s fracture as a moderate one. He treated plaintiff while he was in the hospital for six dáys following the accident and at intervals until April 13, 1950, when he last saw plaintiff. He testified that comparison of the December 31st and April 13th x-rays showed that an examination of the April 13th x-ray of the area concerned revealed evidence of “some healing as compared to the original x-ray taken December 31st,” and he thought that plaintiff’s condition was such that he should have continued to wear braces for six to seven months after the accident.
Dr. F. J. MacPherson, an orthopedic specialist, was called by defendant. He testified that plaintiff had suffered a minimal compression fracture of the twelfth dorsal vertebra, and that six months was a normal duration of disability as the result of such an injury. He doubted that any disability should remain at the end of a year, but thought that the confinement, rest and restriction of movement induced by the treatment of plaintiff’s fracture could diminish his blood supply and set up a condition of hypertrophic arthritis.
Dr. T. M. Oxford, an orthopedic specialist, was called in as a consultant while plaintiff was under treatment at the hospital, but was not called as a witness by either of the litigants.
Plaintiff’s fellow workmen and other lay witnesses testified that he was in excellent physical condition before the accident and able to perform without difficulty his duties as mail carrier and his outside work as a carpenter, but that since the accident he had a stooped appearance and moved cautiously and with the air of one not sure of himself.
The jury was justified under the evidence in concluding that plaintiff was, at the time of the trial, disabled from carrying on his Occupation as a mail carrier or from doing heavy carpentry work, either as the result of the injury itself or as an outgrowth of the treatment followed. The testimony does not establish the duration of this condition and the completeness and extent of the potential recovery.
Plaintiff introduced in evidence a letter from the Federal Security Agency, Bureau of Employees Compensation, which contained the- statement that the information on file in his case showed that the injury had not been incurred while in the performance of duty and concluded by stating that the case would be held open for thirty days to permit presentation of additional evidence. The record does not disclose whether or not further evidence was presented.
The assistant superintendent of mails at the Shreveport post office where plaintiff was employed, quoted the rule with reference to separation or retirement as follows: “ ‘However, an employee who has been absent for one year on account of illness and who has had as much as five years service to his credit to entitle him to retirement, shall not be separated from the service until he has been given an opportunity to retire — * * * on account of disability under the Act.’ ”
There is no testimony in the record to indicate the amount plaintiff would receive in the event of his retirement either because of his injury or by virtue of his twenty-odd years of service, or of a combination of the two.
*676 Tlie record also shows that a postal employee who is prevented by illness from performing his duties for a period of twelve months is separated from the service without prejudice, that is, as one witness described it, “when he is separated without prejudice, he can come back to work if he is physically able.”
We therefore find it difficult to measure with any degree of accuracy the amount of monetary loss plaintiff will sustain during the period of his disability.
The medical testimony as a whole established that plaintiff received a serious injury, including the compression fracture of the -twelfth dorsal vertebra, together with an undetermined amount of damage to the nerves and other tissues in the immediate area. The preponderance of the testimony is that his condition will improve, although it is not established that his recovery will ever be complete. Under the circumstances, and after a careful review of the medical and lay testimony, and taking into consideration the verdict of the jury, the awards made in other cases, and the decreased purchasing power of the American dollar, we have concluded that plaintiff should receive an award of $20,-000.00 for his permanent injuries, pain, suffering and loss of earnings. He should also recover the $310.90 due for medical services at.the North Louisiana Clinic.
Therefore, the judgment appealed from is amended by reducing same to $20,310.90, and as amended, same is affirmed. Plaintiff to pay costs of appeal; all other costs to be borne by defendant.