80 So.2d 206 (1955)
Cecll Bates REEVES, Plaintiff-Appellee,
v.
STATE of Louisiana and/or Department of Highways of the State of Louisiana, Defendant-Appellant.
No. 8310.
Court of Appeal of Louisiana, Second Circuit.
April 14, 1955.
On Motion to Correct May 18, 1955.
Writ of Certiorari Granted June 30, 1955.
Rehearing Denied January 9, 1956.[*]
Writ of Certiorari Granted February 23, 1956.
*207 W. Crosby Pegues, Jr., D. Ross Banister, Philip K. Jones, Francis X. Vinet, Louis S. Quinn, Joseph A. Loret, Baton Rouge, for appellant.
McIntosh, Sims & Hester, Oak Grove, for appellee.
AYRES, Judge.
Plaintiff instituted this action against the State of Louisiana through the Department of Highways for damages in the sum of $20,457 for personal injuries, pain, suffering and mental anguish, permanent disability, loss of wages and earnings and medical and hospital expenses incurred in the treatment of his injuries, pursuant to the provisions of Act 41 of 1946, as the result of an accident about 8:30 o'clock P.M., April 24, 1946, on U. S. Highway No. 65 at the state line between the states of Louisiana and Arkansas.
Negligence as a proximate cause of the accident was charged to the Department of Highways and its employees by their failure to erect and maintain a protective barricade at the end of pavement on a concrete highway and by their failure to post and maintain adequate warning signs and *208 signals. For defense, plaintiff was charged with negligence proximately causing the accident by driving at an excessive rate of speed and letting his car get out of control, and by not keeping a proper lookout ahead or taking precautions to prevent the occurrence of the accident.
From the judgment in plaintiff's favor for $15,457.50, defendant prosecutes this appeal. Plaintiff has answered the appeal, praying that the judgment appealed be amended increasing the award to the amount originally sued for.
U. S. Highway No. 65, on which the accident occurred, traverses several states and those parts of it that are in the State of Louisiana are public state highways. This highway runs in a general north and south direction through the Parish of East Carroll and continues such course northward across the boundary line as it enters the State of Arkansas. That portion of this highway which is in said Parish was paved with concrete paving about 1933. From the aforesaid state boundary south for a considerable distance, the highway is straight, and, at the time of the accident, was in splendid condition so far as the concrete slab and roadway were concerned, but, at the time of the accident the pavement did not extend further north than the state line.
From the end of the concrete slab and connecting therewith a dirt fill or embankment extended into the State of Arkansas, which embankment was built by the Arkansas authorities for the purpose of placing pavement thereon. On top of this embankment and somewhat on its left side was a sort of passage or dirt road which was occasionally used during the dry season. This embankment, however, at the time of the accident was some 6 to 8 inches lower than the concrete pavement and was very rough, and on the right-hand side thereof and in the lane of traffic proceeding northward into the State of Arkansas were holes of considerable depth.
No adequate or effective warning signs, such as signals, lights or barricades, were erected or maintained by the Department of Highways to give notice to or warn approaching traffic of the end of the pavement or of the condition existing there. Although a barricade was formerly maintained across the highway and for a time lights were maintained as a warning, the barricade had been destroyed, and the lights discontinued several months prior to the date of this accident. Defendant contended that it was difficult to maintain the barricade; motorists would run into it and break it down; and materials for replacement were difficult to obtain at the time.
The roadside signs were inadequate and insufficient for the purpose intended. There was one located on the shoulder to plaintiff's right 1,170 feet south of the end of the pavement at the state line. This sign bore the legend "Stop, Slow Ahead". However, due to its leaning position, it was most difficult to read. 260 feet beyond that sign, or 910 feet south of the state line, was the only other sign, which indicated a curve to the left, notwithstanding that the road was straight for some distance in both directions.
There, however, was constructed as a detour at the time of the accident, a short distance west of and approximately parallel to the paved highway and to the dirt embankment, a black-top road, the surface of which was approximately 2 feet lower than the concrete highway. This road joined the pavement 677 feet south of the end of the pavement. A short distance across the state line the black-top road again intersected the main highway.
That the defendant, through the Department of Highways and its officials and employees, had actual notice and knowledge of the aforesaid facts and circumstances and dangerous condition of the highway at the state boundary and of the fact that no proper or adequate barricade was maintained and that no proper or adequate signs or signals were posted or maintained, does not admit of dispute. On January 23, 1946, Mr. J. S. Trezevant, an employee of the Department of Highways and a junior traffic control analyst, made an inspection of the signs on this highway as it approached the Arkansas line. At that time *209 he found the two signs referred to, and, at the end of the concrete pavement, a barricade that extended entirely across the width of the pavement. This was constructed of 3" × 10" × 18' lumber bolted to 6" × 8"' posts 6 feet long, painted white with the usual black stripes. A month later another inspection by this official disclosed this barricade had been destroyed. No attempt was made thereafter to replace it.
Numerous accidents had happened at this location, and the Department of Highways and its employees had information of the occurrence of many of them, not only through their own observation but through reports and complaints made by others.
It was contended that every time a barricade was erected some motorist would run through and demolish it. That such may have resulted through its fault in not maintaining proper warning signals does not appear to have occurred to the department or its employees. Local citizens, realizing the danger of the situation, became incensed and registered a protest with their State representative two weeks before this accident occurred, who, by telephone, conveyed the protest to the department. Notwithstanding, however, no action was taken to remedy the conditions until the occurrence of the accident in which plaintiff herein was injured.
There is a mandatory statutory duty of the Department of Highways to erect and maintain proper and adequate signs, signals and warning devices necessary for informing, directing, cautioning and warning the traveling public of any unusual situation or dangerous condition on the highways or to its approaches which may impede or obstruct the safety of traffic. The aforesaid change in grade or surface level of the road, the "jump-off" and the end of the paving constitute such obvious and serious obstructions and dangers as are contemplated by the statute, LSA-R.S. 48:345, which, in part, reads as follows:
"The department shall erect and maintain all signs, signals, or devices necessary for informing, directing, cautioning, and warning the traveling public."
The due care therefore owed by highway authorities to motorists requires the posting of notices and signs warning them of dangerous conditions. The general rule is stated in 60 C.J.S., Motor Vehicles, § 192, page 530:
"While the exercise of reasonable care by highway authorities toward motorists may require a placing of signs warning of dangerous conditions, as where there are obstructions or excavations in the way, or the highway terminates abruptly, or a bridge has been destroyed, warning signs need not be maintained at places which do not present an extraordinary condition or unusual hazard, as, for example, at curves of an ordinary character in the highway. Warnings or notices need not be given where the physical facts give sufficient warning of the danger. Where a barrier gives ample and timely warning of the dangerous condition of the road, there is no duty devolving on those in charge of the highway to post notices of the condition of the road some distance therefrom. In determining what is reasonable warning, the place at which the danger exists, the nature of the road, and the general situation and circumstances surrounding it are to be taken into consideration, as are also the kind of travel and the speed at which vehicles will probably travel on the road."
To the same effect are the decisions in Department of Highways v. Fogleman, 210 La. 375, 27 So.2d 155; Department of Highways v. Jones, La.App., 35 So.2d 828; De Hart v. State, La.App., 46 So.2d 366; Rosier v. State, La.App., 50 So.2d 31; Goodwin v. Department of Highways, La. App., 53 So.2d 161, and Davis v. Department of Highways, La.App., 68 So.2d 263.
In general, the duty imposed upon a state and/or its department of highways or other appropriate authority is to construct and maintain highways which are *210 reasonably safe for public travel of the usual kind and character, having in view the character and location of the road and the amount and nature of the traffic. For instance, it is stated in 40 C.J.S., Highways, § 254(b), page 293:
"In general the duty imposed on the highway authorities is to maintain the highways in a condition reasonably safe for travel, having in view the probable traffic and the character of the road and the use reasonably to be anticipated. So, in determining whether a highway is in a reasonable state of repair, its location and character and the extent of travel thereon are to be considered.
"The duty to keep the highway in a reasonably safe condition means safe for general or ordinary travel, or use for any lawful and proper purpose, including use for both pedestrians and vehicles, such as bicycles and motor vehicles, * * *.
"The duty is to keep a highway safe for a traveler himself exercising ordinary care, and a highway will be deemed safe within the usual requirements if it may be negotiated successfully by all but the most reckless and careless drivers, as there is no obligation so to construct and maintain highways as to insure the safety of reckless drivers, * * *.
"Under principles of law imposing liability for defects in highways, any road not reasonably safe for the reasonable use of the traveling public will be deemed defective, a `defective road' within the meaning of statutes permitting civil actions for recovery of damages for injuries sustained by means of a defective road being defined as one not reasonably safe for travel in view of the purposes for which it is needed and used. Conversely, a road claimed to be defective must be not reasonably safe for public travel. Omission to supply statutory safeguards on a highway constitutes a defect within the meaning of statutes of this character." See also Preuett v. State, La.App., 62 So.2d 686.
The general rule is also well established and recognized in the jurisprudence of this state that a motorist using a public highway has a right to presume and to act upon the presumption that the highway is safe for the usual and ordinary traffic, either in daytime or at night, and that he is not required to anticipate extraordinary danger, impediments or obstructions to which his attention has not been directed.
Blashfield's Cyclopedia of Automobile Law and Practice, Volume 5A, 387, "Highways", § 3320, states such rule as follows:
"In the absence of notice to the contrary, there are certain assumptions which may be indulged by a motorist as to the condition of public streets and highways, whether he be traveling by day or night. Among these are: (a) That the way is reasonably safe for travel and free from defects and unlawful obstructions; (b) That those charged with the duty of keeping it so have exercised a proper degree of diligence in so doing; (c) that it will not be obstructed unlawfully or in such a manner as to cause an injury to him while he is in the exercise of due and reasonable care; * * *."
See also Jacobs v. Jacobs, 141 La. 272, 74 So. 992, L.R.A.1917F, 253; Kirk v. United Gas Public Service Co., 185 La. 580, 170 So. 1.
In Rosier v. State, supra [50 So.2d 37], this court held the highway authorities negligent in failing to erect a barricade across a flooded highway, although a sign was erected a mile away proclaiming "`Road Under Water, Travel At Your Own Risk.'" It was concluded that such negligence was the proximate cause of the accident when a car driven onto the flooded portion of the highway was swept over the road embankment. There it was held that the duty of maintaining the highway in a safe condition includes the duty of providing proper safeguards or giving adequate warning of dangerous conditions in the highway; that in *211 determining what is a reasonable warning the place at which the danger exists, the nature of the highway and the general situation and circumstances surrounding it are to be taken into consideration, as well as the kind of travel and the speed at which vehicles will probably travel; that due care may require the safeguarding of dangerous places by the erection and maintenance of suitable barriers, guard rails or fences; and that negligence on the part of the highway authorities may be predicated on their knowledge or information of the existence of a dangerous or defective condition of the highway without proper safeguards.
We find these rules applicable to the situation here as the highway authorities had knowledge of and recognized the unusual danger existing at the end of the pavement on U. S. Highway 65 at the Arkansas line. Several barricades had been erected there. The last one erected was, to the department's knowledge, and that of its employees, demolished two months before the accident and was never replaced, notwithstanding only two weeks before the occurrence of the accident presently involved, another serious accident happened at the same location.
In Goodwin v. Department of Highways, supra, the defendant was held negligent by failing to erect adequate warnings of a washed out bridge. No warning signs were posted, and the motorist proceeded around a curve up a slight grade at night and crashed through a fence erected across the highway approximately 20 feet from the wash-out, plunging himself and car into the swift, swirling waters of a river.
In De Hart v. State, supra, the Department of Highways was held negligent in laying a culvert across the road covered with a mound of dirt approximately 7 inches above the road surface, where there were no warning signs, when a motorist struck his head on the top of his automobile when the vehicle severely bounded as it passed over the culvert.
While no hard and fast rule can be laid down as to the type of warning or barricade that should be erected or maintained by the highway authorities to warn the public of such hazards, the warnings and means of protection should be of a size and nature commensurate with the danger that lies ahead. For instance, where the pavement ends, such as it did here, with the adjoining surface considerably below the paved surface, a complete barricade should be erected and properly lighted, at appropriate and safe distances from such dangers. Warning and detour signs should have been erected and maintained.
Defendant's contention that the signs heretofore referred to were adequate and their failure to repair a destroyed barricade did not constitute negligence is untenable in view of its actual knowledge of the dangers involved. The principal sign, "Stop, Slow Ahead", if it had been properly erected and clearly visible, was not only inadequate but it was absolutely meaningless and served no purpose as a warning of the end of the pavement. The alleged curve sign was of no greater importance. There was no curve. Defendant's contention that the presence of the sign, and the absence of the curve, should have been sufficient notice of the existence of some other condition down the highway, such as the ending of the pavement, is likewise untenable. Neither is a "curve" sign any indication of a detour.
The above resume of the facts leaves no doubt of the gross negligence of the Department of Highways and its employees in its failure to provide adequate barricades and warning signals and devices for motorists of the aforesaid dangerous conditions existing at the scene of the accident. We conclude, as did the trial court, that such negligence constitutes a proximate cause of the accident forming the basis of this action.
Our attention is next directed to defendant's charge of negligence against plaintiff as constituting a proximate cause of the accident, or, in the alternative, contributory negligence barring recovery. A brief resume of the facts involved is in order for a *212 proper understanding of the issues presented for consideration.
This was the first time plaintiff had the opportunity of traveling this highway and he had no previous knowledge of the condition of the highway. Plaintiff, accompanied by his father, was driving his father's automobile from his father's home in Wesson, Mississippi, to Seattle, Washington. Before leaving their home about the middle of the afternoon, they secured a highway map and selected their route. On reaching Tallulah, Louisiana, inquiry was made as to the highway to Little Rock, Arkansas, whereupon information was given them that it was paved all the way. They were traveling 40 to 45 miles per hour, which was a reasonable and moderate speed. Plaintiff did not see the sign "Stop, Slow Ahead" but did notice the "curve" sign, but there was no curve. As stated before, there was no detour sign and plaintiff did not see the detour road, which ran parallel for some distance with the concrete highway, a possible reason therefor being that the detour road was some 2 feet lower than the main concrete highway. In the absence of any sign indicating a detour, it was not unreasonable for plaintiff to pass up such road without noticing the same. Plaintiff soon, however, began to wonder about the erroneous signs, and when within 100 to 150 feet of the end of the paving, he saw what appeared to be a change in the composition of the surface of the highway, such as from concrete to asphalt. He was in the act of applying his brakes when he suddenly saw and realized that the concrete slab ended about 15 feet in front of his car and there was a jump-off. This condition, due to the decline of the road and the darkness of the night, could not have been discovered at a greater distance. The sudden drop of the car as it left the pavement produced a severe jolt and jar that caused plaintiff to be thrown upward with considerable force, disengaging his foot from the brake pedal. Control of the car was lost and it proceeded into a large hole in the dirt road, turning over several times before finally coming to rest in the roadside ditch. Plaintiff was thrown from the car and sustained a broken back.
Negligence charged against plaintiff might be summarized as follows: (1) That plaintiff as he approached the "Stop, Slow Ahead" sign 1170 feet from the end of the pavement should have observed the sign and governed himself accordingly; (2) that plaintiff on seeing the curve sign, located 910 feet from the end of the pavement, should have realized, in the absence of a curve in the highway, that something was evidently wrong and should have slowed his automobile and brought it under such control so that it might have been stopped instantly; and (3) that when plaintiff saw that the concrete ended, he should have stopped his car before running off the pavement.
We have already shown that plaintiff had a right to presume that the highway was safe and free of obstructions. Our appreciation of all the evidence in the record convinces us of the correctness also of the observations made and conclusions reached by the trial court in these additional particulars:
1. That plaintiff was driving at an orderly and reasonable speed of 40 to 45 miles an hour, which indicates that he had reasonable control of his car;
2. That ordinarily the Louisiana highways have excellent markings, which cause careful motorists to depend on these markings for guidance, especially when traveling on an unfamiliar highway.
The record, therefore, fails to support defendant's charge of negligence against plaintiff either as a proximate cause or as a contributing cause of the accident.
Finally, it is urged that neither the state nor any of its agencies is under any obligation to take precautions to prevent accidents on roads in another state; that the accident involved is one that resulted when plaintiff's automobile ran into a hole on a dirt fill, which was located in the State of Arkansas and, therefore, entirely *213 outside of the State of Louisiana. While, so far as this court has been able to ascertain, this presents a novel factual situation, we are of the opinion, under the facts and circumstances, that defendant's contention is untenable. The cause of the accident arose in Louisiana, where defendant's negligence created a chain of circumstances which resulted in the accident. The injuries caused thereby were simply an end result of prior causes existing in this State. Consequently, the actual situs of the accident did not exonerate the Department of Highways from liability as it was through its and its employees' negligence the accident was produced which caused the injuries. Therefore, that the damage done and injuries sustained occurred in Arkansas is of no importance or consequence.
Finally for consideration is the question of quantum. The usual controversy between the parties, of inadequacy of the award on the part of the plaintiff and excess on the part of the defendant, exists.
Plaintiff was temporarily unconscious. Passing motorists placed plaintiff in their car, and conveyed him to the clinic of Dr. Forrest M. Terrell in Lake Providence. Immediately following the accident and on arrival at the clinic, plaintiff was unable to walk and he complained of excruciating pain localized in his back. Dr. Terrell made an examination and took x-rays and found an injury to his spinal column. His findings were a fracture of the sixth dorsal vertebra with an abnormal continuity of bone, and a compressed fracture of the eleventh dorsal vertebra. Plaintiff was given a sedative to relieve pain and was transferred by ambulance to the Lutheran Hospital in Vicksburg, Mississippi, the following morning. In the meantime, however, the doctor observed that plaintiff was suffering extreme pain, especially on movement of his lower extremities.
At the Vicksburg hospital plaintiff was treated by Dr. Joseph M. Moore, an orthopedist, who first made a complete physical examination in conjunction with x-ray films of plaintiff's spine. This examination and x-rays revealed that plaintiff had a severe compression or crushing of the eleventh dorsal vertebra. The doctor explained this condition is commonly referred to as a "broken back". Examination further showed that plaintiff had bruises about his chest and back, and laboratory tests revealed large amounts of fat or bone marrow present in his urine.
A general anesthetic was then administered and an attempt was made to reduce the fracture, a procedure commonly expressed as "setting a fracture". A plaster cast was then applied, which covered the entire body from the neck to the groin, extending down the right thigh to the knee. The bruises to his body were surgically dressed before applying the cast. On the following day x-rays were again made, which showed the process of reducing the fracture had not been successful. The cast was then removed and plaintiff was placed on a frame made of gas pipe and canvas, where plaintiff was stretched so as to forcibly bend his back in the form of a half circle, in which condition plaintiff remained until May 7, or for a period of 13 days, at which time, without an anesthetic, a plaster cast was applied over the entire body and he was transferred by ambulance to the Veterans Hospital in Jackson, Mississippi. The doctor testified that the fracture had not been reduced satisfactorily when plaintiff was transferred to the Veterans Hospital.
During the first five days he was in the Lutheran Hospital plaintiff experienced a complete paralysis of the intestines and a partial paralysis of the bladder, which conditions cleared up under treatment.
Plaintiff remained in the Veterans Hospital until August 13th and was admitted again for two weeks in November. While in the hospital there on the first occasion, a third cast of plaster of paris was applied, covering most of his body. After he had worn this cast for 3½ months it was removed and a steel brace was provided, which he used for four months before he was able to walk without it.
*214 We are not favored with the testimony of the Government doctors as to the course of their treatment or the progress of recovery made by the plaintiff. However, Dr. Moore testified that he examined plaintiff again March 21, 1947. Dr. Moore said:
"The patient was able to walk without support. He walked with an obvious effort to protect his back and he sat down or lay down in a bed very carefully. He was able to bend over to touch his knees but not his ankles. There was a mild wasting away, which physicians call atrophy, of the muscles about the center of the back. He was unable to bend his back more than 80 per cent of normal amount and he could not arch his back backwards at all. He complained of much pain when I attempted to bend his back myself. He had a loss of feeling over the left ring and small fingers. I secured X-ray films and these showed that the vertebra was still partly crushed in. They also indicated that no further improvement in this crushing process could be expected."
As to the extent of plaintiff's disability, the doctor further testified:
"One year after the original injury this patient was unable to do hard physical labor and activities such as lifting, stooping, repeated bending over to pick up objects, etc. He would tire and develop pain in the middle of his back during the course of a day's light exertion, such as sitting at a desk and would have to seek relief by resting, the only position of rest being that of a recumbent or lying down attitude. He would not have the same agility in his back. In other words, he would be somewhat stiff and he would tend to pick up objects by bending the knees and hips rather than bending over at the back. He would not be particularly good at strenuous sports and would tend to avoid the usual athletics of a young man of 24. All in all, he would have to select an occupation in keeping with his disability and he would have to protect his back and seek frequent rest periods even in an occupation not involving heavy work."
Thus, it was the doctor's opinion, as he testified on March 28, 1950, almost four years subsequent to the accident, there would not be any useful improvement in plaintiff's condition except possibly in his gait. The doctor was also of the opinion there was a feature of arthritis developing as a result of the wear and tear on the compressed vertebra, which condition would become worse and afflict plaintiff the remainder of his life.
At the time of the accident plaintiff was a young man 23 years of age, a graduate of a high school as well as of an agricultural junior college, which he attended for two years, majoring in agriculture. He had also served a term in the United States Navy. He owned a small farm, purchased in 1945, and contemplated engaging principally in dairying and/or general farming and the growing of seed. He found it impossible to pursue his intention as to dairying because the work was too strenuous. Since the accident he has not been able to do any part of the arduous or substantial duties of such an undertaking. He did, however, secure a temporary position with the Soil Conservation Service. After a civil service examination he secured permanent employment with such service at an annual salary of $2,875.
No other conclusion could be reached other than that plaintiff is disabled for life and that he will experience and suffer pain and discomfort hereafter, with the possibility of an increase in the difficulty and suffering; and that he will never be able to do any work or engage in any undertaking or recreation which requires strenuous exercise, such as stooping, bending or lifting.
Plaintiff prayed for judgment in the sum of $10,000 for pain and suffering and mental anguish; $10,000 for loss of future wages and earnings and for permanent injuries *215 and disability, and $457 for medical and hospital expenses incurred in the treatment of his injuries. In the case of Burnett v. Yellow Cab Co. of Shreveport, Inc., 50 So.2d 670, where this court found that plaintiff received a serious injury, including a compressed fracture of the 12th dorsal vertebra, together with an undetermined amount of damage to the nerves and other tissues in that immediate area, which condition would likely improve but fall short of a complete recovery, an award of $25,000 for permanent injuries, pain and suffering and loss of earnings was held excessive and reduced to $20,000. Under the circumstances, and after a careful review of the medical and lay testimony, taking into consideration the awards made in other cases, as well as the decreased purchasing power of money, we have concluded that the award made herein should be increased as prayed for.
Therefore, the judgment appealed is amended by increasing the award to $20,457, and by limiting the costs to be paid by the defendant to the amount of the stenographer's fees, pursuant to LSA-R.S. 13:4521 and in accordance with the decision of the Supreme Court in Makofsky v. Department of Highways, 205 La. 1029, 18 So.2d 605, and, as thus amended, is affirmed.
Amended and affirmed.
On Motion to Correct.
PER CURIAM.
Plaintiff in his original petition prayed for interest on the amount of damages claimed by him. The judgment of the trial court, which omitted any reference to interest, was, on plaintiff's answer to the appeal praying for an increase in the award "and for all general and equitable relief," amended by judgment of this court rendered April 14, 1955, which increased the award to the amount prayed for, and, as thus amended, was affirmed, again without any specific reference to interest. This omission was first called to our attention in a motion filed by counsel for plaintiff which was denominated as a "Motion to amend patent error in judgment rendered on April 14, 1955." Plaintiff therein prayed that the judgment be corrected so as to specifically allow the interest demanded.
LSA-R.S. 13:4203, having for its source Act 206 of 1916, provides:
"Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, `ex delicto', which may be rendered by any of the courts."
In Caldwell v. City of Shreveport, 150 La. 465, 90 So. 763, 764, the plaintiff in an action for damages prayed for interest from judicial demand which was allowed only from date of judgment. It was held that where plaintiff in answering an appeal prayed that judgment be rendered as prayed for in the petition and for general relief, such pleadings warranted the allowance of interest from judicial demand. In construing the aforesaid Act, now incorporated in the Revised Statutes, the court said:
"The recovery of legal interest on the judgment from the date of judicial demand is therefore a matter of absolute right."
In later construing this statute, the Supreme Court, through the present Chief Justice, in LeBlanc v. New Amsterdam Casualty Co., 202 La. 857, 13 So.2d 245, 248, stated:
"`The language of the statute is mandatory and declares that all judgments shall bear interest from date of judicial demand, and this is true though the litigant does not demand it, or the judgment so provides. Layne v. Louisiana Power & Light Co., La.App., 164 So. 672.'"
To the same effect is the holding in Grennon v. New Orleans Public Service, Inc., 17 La.App. 700, 136 So. 309.
This court in Webb v. Vicksburg, S. & P. Ry. Co., La.App., 119 So. 720, 721, and *216 in Layne v. Louisiana Power & Light Co., supra, was presented with identical questions as to the allowance of interest and judgments were corrected in per curiams without the necessity of granting a rehearing. In the former case it was stated:
"Under the above-cited act and decision, there can be no controversy over the question as to whether the appellee is entitled to interest from judicial demand, and, for that reason, it is not necessary that we grant a rehearing in order to amend our decree in that respect. Our attention having been called to the patent error, we correct it, without granting a rehearing. Gomila & Co. v. Hibernia Insurance Co., 40 La. Ann. 553, 4 So. 490; Graf v. Friedlander, 33 La.Ann. 188."
No exceptions are provided in favor of the State. The jurisprudence since the passage of Act 206 of 1916 is uniform in holding that in an action in tort where a judgment is rendered against the State an award of legal interest from the date of judicial demand is proper. Hixson Funeral Home v. State, La.App., 33 So.2d 754; Ropollo v. State, La.App., 23 So.2d 374; Guercio v. State, La.App., 15 So.2d 170; Lively v. State, La.App., 15 So.2d 617; Harrison v. Louisiana Highway Commission, La.App., 11 So.2d 612.
Therefore, adopting and adhering to the procedure followed in the cases of Layne v. Louisiana Power & Light Co. and Webb v. Vicksburg, S. & P. Ry. Co., both supra, the error patent on the face of the judgment appealed will be corrected without the formality of granting a rehearing. It is apparent from the decisions cited hereinabove that the judgment in this case, without any specific reference thereto, carries interest from judicial demand, but, in order to prevent confusion, it is now amended so as to allow legal interest from judicial demand until paid.
The motion, therefore, to correct an error patent on the face of the judgment is allowed.
NOTES
[*] See 83 So.2d 889.