87 So.2d 380 (1956)
Robert J. SMITH
v.
STATE of Louisiana through the DEPARTMENT OF HIGHWAYS of the State of Louisiana.
No. 4210.
Court of Appeal of Louisiana, First Circuit.
April 27, 1956.
Rehearing Denied May 25, 1956.
*381 W. Crosby Peguez, Jr., D. Ross Banister, Philip K. Jones, Baton Rouge, for appellant.
Burton & Roberts, Baton Rouge, for appellee.
ELLIS, Judge.
This is a tort action wherein the plaintiff seeks damages for personal injuries as well as property damages to his automobile. An accident occurred shortly after dark at the end of a service road on the Air Line Highway between Baton Rouge and Gonzales, Louisiana. The plaintiff alleges the Department of Highways of the State of Louisiana did not maintain an adequate warning system at the end of the service road and that he drove his car into a ditch as there were no warning systems sufficient to apprise him of the danger. The service road was constructed by a contractor who was called in warranty. However, the defendant dismissed the call in warranty, and upon the trial below judgment resulted in favor of the plaintiff, and the defendant has appealed. The appellee answered the appeal seeking an increase of the awards given.
The Department of Highways, through contract, had constructed an interchange and certain other works at the junction of Jefferson Highway and the Baton Rouge by-pass, in the Parish of East Baton Rouge. This last highway is known as the Air Line Highway and runs generally in a northerly-southerly direction. Parallel thereto there was constructed a service road which lay to the east of the Air Line Highway and ran practically parallel to it. Its surface was black-topped and was about 20 feet wide, connecting with the old highway at its southern end and running north for about one and one-half miles, where it ended. About 5 feet north of the end of this black-topped surface the embankment, whereon the surface was built, dropped off into a ditch which ran across the entire width of the roadway. This ditch was approximately 5 feet deep and about 12 feet wide. The service road continues along a right of way to the north of this ditch. The whole highway project, including this service road, was accepted by the Department of Highways on October 27, 1953. The accident occurred November 3, 1953.
When the contractor finished the job a barricade sign and three flares were left at the end of this service road where it ran to the mentioned ditch. This sign at the time of the accident was not permanently fixed to the earth and was about 4 feet high and 5 or 6 feet wide. It was on the extreme left side of the roadway and there was no barrier on the eastern 14 feet of the black top, leaving this right hand portion clear and unobstructed. The sign was placed at the end of the black-top surface, *382 some 5 to 7 feet south of the ditch. There were no reflector lights, flares or any other warning devices. The evidence clearly discloses that the Department of Highways had not installed any warning of this road end or any signals of any nature.
At approximately 6 P. M. and after dark, the plaintiff was traveling from Port Vincet to Baton Rouge, when he entered this service road. He was driving at about 35 miles per hour upon the right hand portion of the black top. When the sign on his left came within the range of the head lights of his car he was unable to stop his vehicle and it went off of the end of the black top, down the embankment to the ditch and struck the far side thereof.
The testimony as to the size and shape of the warning signal varied, but shows the complete roadway was not barricaded and the right portion of the service road was clear and unobstructed, ending at a ditch. There is no contradiction that the sign had no reflectors, luminous paint or any other warning devices.
Rosier v. State, La.App., 50 So.2d 31, 35, discussed the legal duty to maintain a highway in a safe condition and the liability for failure to warn the public of a dangerous condition.
"The State of Louisiana, through the Legislature, having consented to the present suit, has voluntarily placed itself in the same legal position with reference to liability for failure to warn the public of the dangerous condition of the highway arising from the action of the elements, as that of the municipalities within the state with reference to the roads and streets within their respective limits. Following are recognized statements of the rules of law applicable to the case before us:
"`The duty of maintaining a highway in a safe condition, as discussed supra § 254, includes the duty of providing proper safeguards or giving adequate warning of dangerous conditions in the highway; and this duty is applicable to pedestrians as well as to travelers in vehicles. Accordingly, subject to the rules discussed supra §§ 248-253 relating to the liability of persons and governmental bodies for injuries from defects or obstructions in the highway, the state or governmental body or officer charged with the maintenance of the highway is liable for neglect to guard, place lights around, or otherwise give warning of, obstructions and dangerous points in a highway, or for neglect to furnish suitable barriers or guard rails, as where the road is undergoing repair, wherever necessary for the reasonable safety of travelers, but not otherwise.' Volume 40, Corpus Juris Secundum, Highways, § 262, p. 306.
"`While the exercise of reasonable care may require a placing of signs warning of dangerous conditions, as where excavations have been opened in the public highway, or the highway terminates abruptly, or a bridge has been destroyed, warning signs need not be maintained at places which do not present an extraordinary condition or unusual hazard, as, for example, curves in the highway of an ordinary character. Where a barrier gives ample and timely warning as to the dangerous condition of the road, there is no duty devolving upon those in charge of the highway to post notices of the condition of the road some distance therefrom. In determining what is reasonable warning, the place at which the danger exists, the nature of the road, and the general situation and circumstances surrounding it are to be taken into consideration, as are also the kind of travel and the speed at which vehicles will probably travel on the road.' 42 Corpus Juris, Motor Vehicles, Section 499, page 842, 60 C.J.S., Motor Vehicles, § 192.
"`In the case of travel by motor vehicle as in the case of travel generally, due care upon the part of the highway authorities may require the safeguarding of dangerous places by the construction and maintenance of suitable *383 barriers, guard rails, or fenses.' 42 Corpus Juris, Section 501, page 843, 60 C.J.S., Motor Vehicles, § 190.
"`Negligence upon the part of the highway authorities may be predicated on their leaving a dangerous or defective condition of the highway improperly guarded.' 42 Corpus Juris, Section 496, page 841, 60 C.J.S., Motor Vehicles, § 188."
Also, in the same case, 50 So.2d at page 37 we find:
"No hard and fast rule can be laid down as to the type of warning or barricade that should be erected by road contractors or state agencies to warn the public of travel hazards ahead. The warning should be of a size and nature commensurate with the danger ahead. For instance, if a bridge is out, a complete barricade would be indicated. In a case where the road ahead is impassable, or passable only with extreme danger to life, a barricade with appropriate explanatory sign would be in order."
In Reeves v. State, La.App., 80 So.2d 206, at page 209:
"There is a mandatory statutory duty of the Department of Highways to erect and maintain proper and adequate signs, signals and warning devices necessary for informing, directing, cautioning and warning the traveling public of any unusual situation or dangerous condition on the highways or to its approaches which may impede or obstruct the safety of traffic. The aforesaid change in grade or surface level of the road, the `jump-off' and the end of the paving constitute such obvious and serious obstructions and dangers as are contemplated by the statute, LSA-R.S. 48:345, which, in part, reads as follows:
"`The department shall erect and maintain all signs, signals, or devices necessary for informing, directing, cautioning, and warning the traveling public.'"
After reviewing the authorities, the Court, in the Reeves case, said:
"While no hard and fast rule can be laid down as to the type of warning or barricade that should be erected or maintained by the highway authorities to warn the public of such hazards, the warnings and means of protection should be of a size and nature commensurate with the danger that lies ahead. For instance, where the pavement ends, such as it did here, with the adjoining surface considerably below the paved surface, a complete barricade should be erected and properly lighted, at appropriate and safe distances from such dangers. Warning and detour signs should have been erected and maintained."
The duty of the Highway Department in such cases is clear and the above cited authorities are supported by many other cases, both in Louisiana and other jurisdictions, the citation of which would serve no useful purpose herein.
The defendant has urged the plaintiff was guilty of contributory negligence. The record does not bear this out. The hazard presented to the plaintiff while traveling this service road was unusual and certainly was not discernible readily. Our courts have repeatedly held a motorist has no legal duty to anticipate an unusual hazard where there is no adequate warning, but has the right to presume the highway is safe for usual and ordinary traffic, even at night. See Dowden v. State, La.App., 81 So.2d 48, and authorities therein cited. In this case the driver of an automobile ran into an open section of a road from which a bridge had been removed. His speed was some 25 to 30 miles per hour and the weather was foggy. The accident happened at night, but the plaintiff was held not to be guilty of contributory negligence for failing to see this open section upon the theory that the drivers of vehicles have a right to presume the highway is safe for usual and ordinary traffic and are not required to anticipate extraordinary dangers to which their attention has not been directed by adequate *384 warnings. In the present case the plaintiff was traveling at approximately 35 miles per hour and, under the circumstances, this speed was not excessive. He applied his brakes as soon as the sign upon his left came into view. Certainly the hazard was unusual and was not readily anticipated. The trial court who was familiar with the situs of the accident, stated, during the trial: "That may be the finest system of intersections that ingenuity or engineers can evolve, but it is one of the most puzzling places I have ever traveled."
In Goodwin v. Department of Highways, La.App., 53 So.2d 161, 165, the Court, discussing contributory negligence in these types of cases, used the language following:
"Having found the defendant guilty of negligence in failing to erect and maintain a proper barricade, the only other question to be considered is whether plaintiff's deceased husband was guilty of contributory negligence in not observing the black fence barricade in time to stop. The courts of Louisiana have held that a driver of a vehicle must proceed on the road at night with caution, and should observe such a lookout and keep his vehicle under such control as to be able to timely stop same when his headlights reveal the ordinary hazards which may be expected on a road. In accordance with this ruling, drivers who have crashed into disabled vehicles occupying the drivers' right lane have been held guilty of contributory negligence. However, when the hazard is unusual in nature and not readily discernible, the drivers running into same have not been held guilty of contributory negligence. Gaiennie v. Cooperative Produce Co., Inc., 196 La. 417, 199 So. 377; Rea v. Dow Motor Co., La.App., 36 So.2d 750."
We conclude the defendant has not shown the plaintiff to have been guilty of any negligence.
Having concluded the defendant is liable we next consider the question of quantum.
The District Court awarded $686.84 for damages to plaintiff's automobile. Five estimates of repair were filed into the record and this amount represents the lowest bid. Also the testimony shows this bid formed the basis for an adjustment with the collision insurer. This item is correct.
The hospital expenses in the amount of $118.95 was based upon a receipted bill from the Baton Rouge General Hospital and is not contested. This amount is also correct.
The amount of the bill of Dr. Joseph Noto was $225, $200 being for medical services rendered the plaintiff and $25 for a report. The defendant argues that the award for this item should be limited to the actual cost of treatment and the $25 for reports not be allowed as it is an expense of preparation for trial and not an item of damage. We will limit this item to $200.
Dr. Gladney's bill for $14, and the $20.90 item for medicines are not contested and are correct.
The plaintiff alleged a nursing bill of $150 which was not allowed by the lower court, and we are asked to include this amount in the award of damages. The evidence that a nurse was hired and paid $15 a week for a period of 10 weeks to take care of the plaintiff after he left the hospital, is uncontradicted and since no written reasons for judgment were given, the failure of the lower court to include this amount is unexplained. It should be allowed.
The Court below awarded loss of earnings for 7 weeks at $100 per week covering the period from the date of the accident, November 3, 1953, until December 25, 1953. Plaintiff prayed for damages in the amount of $110 per week for a period of 18 weeks, from the date of the accident to March 10, 1954, when he testified he tried to do some trucking but was unable due to pains in his chest, and so had to hire another driver. His testimony was corroborated as to his period of disability and the testimony shows he was able to *385 net $110 per week before the accident. Without written reasons, we are unable to determine just how the lower court arrived at the period of 7 weeks or the amount of $100 per week. Both the amount earned and the period of disability being uncontradicted, the award for this item of damages should have been for 18 weeks at $110 per week, or a total of $1,980.
The Trial Court awarded $4,500 for personal injuries and damages. The plaintiff has answered the appeal urging damage awarded be increased to the amount prayed for, while the defendant contends this amount should be reduced to the sum of $3,000. Both cite as authority for their position the case of Greenberg v. New Orleans Public Service, La.App., 74 So.2d 771. The plaintiff maintains the award of $4,500 is in line with the same award in the Greenberg case, is fair and just for the temporary injuries received by him, but that it does not compensate for the permanent injuries he received. The defendant, on the other hand, urges the injuries received by the plaintiff here were not as serious as those received by the plaintiff in the Greenberg case.
The facts in the Greenberg case and the one at bar are very much the same insofar as the age of the plaintiff, the injuries, the hospitalization and confinement period are concerned. There is some difference in the exact injuries but the over-all facts to be considered in arriving at the damages to the plaintiff herein are so similar to the Greenberg case as to be controlled by the award therein.
Plaintiff contends that the award of $4,500 for personal injuries and damages is fair and just "but does not nearly compensate plaintiff for the permanent injuries." He is asking that the judgment be amended by awarding $15,000 for permanent injuries to plaintiff's heart as the result of "angina pectoris" brought about by the accident. It is true that plaintiff has shown by the testimony of Dr. Thomas Y. Gladney who examined him and treated him prior to the accident in order to determine whether he was in condition to have his teeth extracted that "Mr. Smith did not make any reference to his having chest pain" while he was treating him. At this time plaintiff did have high blood pressure. Plaintiff testified that after the accident he developed pains in his chest which have been diagnosed by Dr. Milton L. Harris as angina pectoris. Dr. Harris stated that the result of his examination indicated plaintiff was suffering with arterio-sclerotic heart disease. Plaintiff was also found to have high blood pressure, enlargement of the heart and thickening of the heart.
Dr. Harris stated that plaintiff complained of pain in the chest on exertion when walking or climbing and he diagnosed this pain along with the physical findings as angina pectoris. Dr. Harris was asked if he had been treating plaintiff previous to Nov. 3, 1953, the date of the accident and had discovered the physical findings which he described, and up until the date of the accident the plaintiff had never complained of chest pains but after the accident he complained of chest pains upon any exertion or exercise, would the doctor consider that the accident had a causal connection with the angina pectoris, and he answered: "Yes, I think if I had been treating him before and he had not had pain and the pain did occur after the accident, I think I would feel it probably had some connection with it."
On cross-examination Dr. Harris stated that plaintiff's arteriosclerotic heart disease was of long standing and could not have been caused by the accident, although he had seen instances where angina pectoris had been caused by an accident. Dr. Harris' opinion was formed as the result of an examination of plaintiff made in February 1955 prior to the trial in October 1955 and he stated that he could not say whether plaintiff at the time of the trial was suffering from angina pectoris. On cross-examination Dr. Harris was asked:
"Q. You stated in your examination that from a mental point of view it was impossible for you to state definitely whether the pain and angina pectoris is a direct result of heart damage associated with Mr. Smith's accident or whether he had spontaneously developed angina pectoris in a previously existing *386 arteriosclerotic heart. Are you still of that opinion? A. Yes, I am.
"Q. And you further stated the spontaneous onset of angina pectoris without any specific participating cause is a fairly * * * is fairly common in of men of Mr. Smith's age with the degree of arteriosclerotis heart disease which he had. Are you still of that opinion? A. Yes, I am."
The testimony above outlined is the strongest in support of plaintiff's claim.
Dr. Noto, who examined and treated plaintiff immediately after the accident and during his hospitalization and shortly thereafter stated that plaintiff could have an angina pectoris "which is very probably due to a severe contusion of the chest because as we readily can see he developed fluid in his lung. Quite naturally, if he developed fluid there is a big leak to the lung and fluid developed. The same thing could have happened to his heart. It could have contused the heart and probably that could have given him an angina pectoris, but I didn't have any cardiogram made. I don't know anything about that, but that is a probability. That is my position on the case." This doctor, however, did not diagnose angina pectoris when he examined plaintiff and frankly stated that at the time of the trial he did not know whether plaintiff was suffering from angina pectoris "but he complains of his chest." Dr. Noto stated that he did not think plaintiff would have permanent effects "because I didn't know anything about his heart." Dr. Noto further intimated that a "pseudo angina" condition could have arisen as a result of the accident to plaintiff which is temporary.
The burden of proving a permanent rather than temporary angina was upon the plaintiff and there is no medical evidence in the testimony of cardiac examination subsequent to February 1955. Further, there is no testimony that plaintiff was attended by any doctor subsequent to his discharge by Dr. Noto, who did not know whether he was suffering from angina pectoris prior to or subsequent to the accident or at the time of the trial, as he made no examination for such a condition. He only knew that plaintiff complained of pain in his chest which was to be expected as his injuries were in the chest region.
In view of all the testimony, plaintiff's angina pectoris could have been attributed to the heart disease which Dr. Harris described as being of long standing, or it could have resulted from an aggravation of the condition due to the injuries which he suffered in the accident. Further, his condition could have been "pseudo angina" which is temporary, rather than permanent, angina pectoris. The burden of proof was upon the plaintiff. The district court evidently did not think he had borne the burden and we cannot say that he was manifestly erroneous in so holding.
For the above reasons, the judgment of the District Court is amended by reducing the amount awarded to Dr. Joseph Noto as medical expenses to $200, and it is further amended by awarding $150 to plaintiff for nursing expenses, and plaintiff's loss of earnings is hereby increased to $1,980.
In all other respects the judgment of the lower court is affirmed.