ELLIS, Judge.
Defendant-appellants have appealed from-a judgment in favor of the plaintiff, individually and as natural tutrix of her minor children, wherein damages were awarded for the death of her husband, father of the minor children. The husband and father, McCraine, was killed in the early morning of February 17, 1956, at approximately four A.M. when returning from “Club Carousel.”
T. L. James and Co. during the month of March, 1955, under contract with the Louisiana Department of Highways had begun to widen Plank Road from a point where it intersected the Airline Highway to where it intersected the Scenic Highway, a distance of approximately three and one-half miles. Under their contract, Plank Road which runs generally north and south, would be widened from a two lane highway to a four lane highway, and on the date of the accident the western lane had *157 been practically completed except for the widening of the bridge across Monte Sano Bayou, which was located approximately one-half mile from its intersection with the Airline Highway.
The testimony and pictures show that in order to extend the culvert bridge and put in the proper railing and concrete foundation, a semicircular hole had been excavated, roughly shown on a diagram by the police department to be 18 feet deep and 21 feet wide, and on the date of the accident it had about 14 inches of water in the triangle formed by the concrete foundation and the bridge or culvert itself. This lane was open to traffic on the date of the accident with the exception of the unfinished portion of the highway leading to the uncompleted Monte Sano bridge or culvert.
McCraine, a young man of 32 years, was employed by Illinois Central Railroad at its Baton Rouge yard and while he worked overtime on many of his shifts, his normal working period was from 3:45 P.M. to 11:45 P.M. On February 16, 1956, he went to work as usual and evidently finished his shift at 11:45 P.M., for around midnight or shortly before he was in the Buck Horn Bar saloon at 1555 North 21st Street where he drank one bottle of beer according to the testimony of the owner. He was alone and stayed there approximately ten minutes. The testimony next reveals that at approximately 1:00 A.M. a friend, Leland Johnson, met him at the Hollywood Lounge on Plank Road. McCraine and Johnson stayed there together for approximately thirty minutes, drank one beer and played the shuffleboard machine. The Hollywood Lounge closed at approximately 1:30 so McCraine and Johnson left in the latter’s car and went across the Mississippi River Bridge approximately one mile to Club Carousel. McCraine left his car at the Hollywood Lounge. In order to go from the Hollywood Lounge to Club Carousel they traveled the Plank Road and presumably passed in the eastern lane, the unfinished portion of the Monte Sano bridge or culvert, which would be to their south as they were traveling in a westerly direction.
After arriving at Club Carousel at approximately two A.M. Johnson testified that they had three or four beers apiece. While Johnson testified that he did not know whether McCraine had anything to drink with anyone else there, it is shown that James W. Cunningham, Jr., who was also at the club, bought a coca cola hi-ball for McCraine, but left before the latter had completed drinking it. Johnson either met or ran into a lady friend at Club Carousel and did not want to leave when McCraine stated that he had something to do in the morning and had to get home. Johnson gave McCraine the keys to his car so that he could drive to the Hollywood Lounge and pick up his own car and proceed home. It is shown that McCraine left between three and four A.M. Club Carousel being west of the Mississippi River bridge at Baton Rouge on the Airline highway, it was necessary for McCraine to return east on the Airline highway to where the Plank Road intersected it, turn to his right or south on Plank Road. The unfinished Monte Sano bridge or culvert was aprpoxi-mately 1/2 mile from the turn off on Airline highway and the Hollywood Lounge was approximately two blocks south of Monte Sano Bayou.
At approximately 8:10 A.M. the next morning, February 17th, Creel, an employee of the defendant James Company who was-in charge of placing flares on that portion of Plank Road under construction by his company, discovered the automobile and body of McCraine in the hole which was excavated in order to extend the culvert or bridge across Monte Sano Bayou. Photographs were taken almost immediately or at 8:20 and also at 4:00 P.M., all of which have been placed in the record and show the body of McCraine face downward with his head and shoulders submerged in the-mud and water. The coroner reported that he had drowned. The car was resting on *158 its left side with the left front door pinned back across the left front fender, showing that evidently McCraine had attempted to escape or the door had come open and he had been thrown from the car.
The extension of the concrete culvert and retaining wall across Monte Sano Bayou were poured on or about February 4, 1956, but due to the fact that it was necessary to allow the concrete work to set, it had not been completed nor had the hole adjacent to the culvert and retaining wall been filled. The testimony and the photographs show a mound of dirt three to four feet high piled across the uncompleted west or southbound lane of travel just in front and back a short distance from the hole. The concrete pavement ended from the excavation or hole. During the time that the concrete was being allowed to set, the James Company had placed “A” frame barriers to the east of the excavation, which would also be along the western edge of the paved southbound traffic lane. The photographs also show dirt piled along this same edge which had been excavated in order to put in the extension of the culvert and retaining wall. Flares had also been placed along the western edge of the old southbound traffic lane. The James Company had placed one “A” Frame barricade about four or five feet high, estimated at six to ten feet from the pavement end on the north. Across the top of this “A” frame was a 2 x 6 inch board and on the six inch facing were black and white stripes each three inches in diameter, which the James Company contended was of a luminous nature when brought under automobile lights. On top of this 2x6 was another 2 x 6 in a flat position or with only the two inch width facing an oncoming driver. This alleged barricade was shown to be 14 or 16 feet in length. On top of this flat board were placed ten flares. Approximately a foot above the ground was another cross-piece upon which rested another 2 x 6 and on top of this 2x6 were four flares.
A.s stated by counsel for plaintiffs in their brief, their suit “was grounded upon the alleged negligence of the contractor for its failure to provide and maintain suitable and adequate barricades, lights and notices to the traveling public.” The defendants, of course, contend that the barricade was adequate warning and in the alternative that McCraine was intoxicated and also guilty of contributory negligence.
The District Court, immediately after the trial, dictated what he believed to be the proven facts in the case and made certain deductions therefrom which later constituted the basis of his judgment on the facts as he required briefs on quantum and gave written reasons for the basis of his judgment as to quantum.
The learned judge of the Lower Court concluded that the barricade which had been placed a short distance back from the end of the pavement with ten flares on it as described was inadequate, and in his opinion there should have been “a solid construction, solidly anchored to the ground so that wind or any other expected agency could not disturb it. The lower court also seemed to be of the opinion that the barricade was probably not there at the time McCraine drove into the hole, for in his reasons he states:
“It is my view, and I have given a great deal of thought to it here during the trial of this case, and each night I have read cases on it, and it is my solemn view that it was the bounden duty of the defendants to know that there was a suitable barrier at all times at that location. Anything can happen to a little movable horse, saw horse as it is referred to, as they had there. Nobody knows whether some other motorist had driven down that highway during the night and had run into it and smashed it all to pieces, scattering the lights, or merely touched it, knocking it over, and I would say that the evidence of all of the parties who heard this accident would indicate to me that *159 they did not hear that car hit that barrier. The fact that this barrier was made of planks 2x6 and the supports of each end probably being 2 x 4s or some such material would suggest to my mind that an automobile coming down that highway at 30 or 40 miles an hour, as it had a perfect right to do, and hitting that barrier made of such material would make a noise ten times louder than the car thudding into the dirt bottom of that canal. It would crash and break and make a noise that would waken anybody up in any reasonable distance of that locality.
* * * * * *
“If the truth could be known it wouldn’t surprise me at all that somebody had hit that barrier before Mr. McCraine did, maybe not square against it as he was going, but maybe veering off to one side and knocking it down or something. I just don’t believe that barrier was standing there when he drove that car into that canal. I have nothing in the world to base that on except the fact that he was not under the influence of liquor to the extent that I would believe his mental capacities would be impaired and the fact that these people didn’t hear any such crash, they only heard a thud, which to my mind would explicitly describe that car falling into that canal. That’s just exactly what kind of sound it would make. I couldn’t think of a better word for it.”
In order for this court to decide whether the barricade as described was of itself sufficient and adequate warning, whether it was standing with the flares intact at the time of the collision, whether McCraine was intoxicated at the time of the accident and whether McCraine was guilty of contributory negligence, it is absolutely necessary that the facts be closely examined.
It is shown that it was generally known by all parties traveling Plank Road that this portion was under construction and also that there were some 250 flares placed and maintained along this three and one-half mile strip each night. There was one sign to the right of the intersection of Airline Highway and Plank Road, however, it is argued with forceful logic that a party turning from the Airline south and to his right on the Plank Road at night would not likely see this sign which read “Road Under Construction.” This is immaterial in this case as there is not the least doubt but that McCraine knew the road was under construction. Furthermore, he had traveled this identical road shortly after 1:30 A.M. or some two and one-half hours prior to his accident and death as a result of driving Johnson’s automobile into the Monte Sano excavation. James’ employee, Creel, each day picked up these 250 flares, cleaned and refilled them and placed them out again in the evening along this three and one-half mile strip of concrete. While the record discloses that Creel was a man of little education, having gone to the eighth grade in school, there is nothing in the record that it would take an educated man to place these flares along the road under construction, and particularly in this case as he was under the supervision and control of the project engineer, Luke H. Hadnot. It is also shown that Creel had been doing this particular job about eight months. Creel testified that he had placed these burning flares on the “A” frame barricade located six to ten feet from the north end of the pavement on the evening of February 16, 1956. There is also positive testimony that they were burning at 9:00 P.M. on that evening. The weather was clear and fair on the night of February 16 and morning of February 17th at about four A.M. according to the records of the Baton Rouge Airport and the testimony of nearby residents who heard an unusual “thudding” at four A.M. that caused them to open their door and look out. The weather was also dry except for usual night dampness which was sufficient to show the tracks of an automobile in the photographs on the pave *160 ment and where it went off the pavement and in the soft dirt between it and the hole.
The first specific question to be decided is whether this barricade was standing at the time of the accident. The evidence is conclusive that the barricade as it is described had been placed south of the excavation and north of the excavation with barricades along the northern edge of the old pavement and flares on the two 'barricades as described since the opening of the lane to traffic. On this question we have the physical facts together with the testimony of some of the nearby residents who testified. One of these residents was a Mrs. Merrill who lived almost directly east or “just across the Plank Road from the scene of the accident,” in a house facing west or toward the scene of the accident. She was employed by the Baton Rouge School Board in the school cafeteria, and testified in part as follows:
“A. Well, that time this happened, I suppose, it was around 4:00 o’clock I heard something that didn’t sound like a crash, but something like a thud or a stone dropped into a pool or something like that and it — right there where it was so close I went to my front door and opened the door and turned my porch light on, but I didn’t see anything so I went on back to bed.
“Q. When you heard that sound were you in bed or not? A. Yes, sir.
“Q. Do you recall whether or not it awakened you or were you already awake at the time? A. Well, I was awake.
“Q. You were awake at the time? A. Yes, sir.
“Q. When you looked out when you came to the door as you said, what was the weather condition? A. Well, at that time of morning, of course, naturally when I turned the porch light on it seemed dark but it wasn’t, it wasn’t raining, for that time of morning it was clear, to my knowledge.
“Q. Can you state whether or not you noticed any fog at all? A. No, sir, I didn’t.
* * t- * * *
“Q. Will you state whether or not before this happened you had ever seen any barricade or flares on the northerly side of Monte Sano Bayou? A. You mean that particular time?
“Q. I don’t mean that morning that you look out, but before then had you ever seen it? A. Oh, yes.
“Q. When you looked out that morning did you or not notice whether that barricade and flares were there or not? A. Well, there were some flares burning I am positive, but I didn’t notice whether they were all burning or not.
“By the court: Q. Where were the flares you say were burning at that time of morning? A. They were by the barricade — I mean by the canal and there were some up by the — along— scattered along the posts on the edge of the road.
“Q. Which side of the road? A. On the west side.
“Q. Any on the east side? A. Well, there were some over there, but they were in the ditch by my driveway. They were not burning.
“By Mr. Hardin: Q. Those that you saw in the ditch by your driveway on the east side, that’s where they were kept burning at night? A. Oh, no, they were not there at night because there was no construction being done on the east side and there was no reason for flares to be put there, and it was dry, but when I went to work that morning I noticed one or two of the flares over on my side of the street.
“Q. Was that usual or unusual? A. Well, it was unusual because I never did find them there before.
*161 "Q. After you heard this thud about 4:00 o’clock in the morning will you state whether or not there were any other noises that attracted your attention? A. Yes, there was, hut I didn’t ever go back to sleep because the barricade — I suppose that must have been what it was after I got up and saw this, there was some of the planks in the main thoroughfare and every time a car would hit it it would make a noise and that kept me awake and I never did go back to sleep. That’s the only unusual noise that was really disturbing.”
This witness positively testified that the only noise she heard was “like a thud or a stone dropping in the water” but that it was not like a crash and further stated that “if there had been a crash I suppose I would have investigated it, being curious as women usually are * * In regard to the burning flares she also testified: “ * * There were some of them knocked over into my driveway and- I know they were not burning * . * Evidently she was referring to the flares .she had previously testified to having found in the ditch right by her.driveway.
We also have the testimony of a Mr. Scott who lived at Mrs. Merrill’s home. He got up about ten minutes to four and “was fixing to put on a little water to make some coffee” when he heard a noise “but it was something like a thud, not a very loud report.” It was not loud enough to stop him from proceeding to put the water on the stove for he stated it did not sound like a wreck, however, about five minutes after hearing the noise he opened the door and looked out, and the weather was clear and “no fog or anything.” He left the house at approximately 4:30 to 4:45 A.M. and walked across the Plank Road to the west side where his car was parked, in fact, he walked across the Monte Sano Bridge at about 4:50 at an angle going south, and when asked whether he saw any burning flares north of Monte Sano Bayou he answered : “I saw a few flares out there burning. How many I didn’t pay too much attention.” He was also asked the following questions and gave the following answers :
“Q. Where were those burning flares that you saw with respect to the new pavement that had been laid on the west side leading up to Monte Sano Bayou? A. Well, I couldn’t really say just what pattern they were sitting in then. I couldn’t say that, I don’t recall.
“Q. Can you state whether or not there were any burning flares. * * * A. Yes, I can.
“Q. * * * North of Monte Sano Bayou and in that new pavement? A. Yes, I can say that.
“Q. About what time was it you saw them ■ there ? A. Somewhere in the neighborhood of 4:30 to quarter to five. I don’t know exactly the time, but somewhere in that neighborhood.
“Q Now, when was it that day that you first learned there had been an accident there? A. That was sometime about 4:30 or 5:00 o’clock that evening.”
Joseph A. Babin testified that he lived approximately four houses north of Monte Sano Bayou on the east side of the Plank Road, and that his house faced toward the west, and that at approximately four o’clock something awakened him “but what it was I don’t know. Something did awaken me,” and he and his wife proceeded to the front porch and looked outside and saw nothing and therefore went back to bed. It is his testimony that the barricade and flares were there every night, and he had no difficulty in seeing them. He-also testified when he looked out at approximately four A.M. the weather was clear with no fog. He saw some flares still burning on the north side of Monte Sano Bayou at the edge of the western lane of travel but how many he couldn’t testify. He thought they were sitting in *162 the dirt at the end of the pavement. On cross examination when being questioned about going to work the next morning and passing by the scene of the accident, he was also asked if he noticed anything unusual and he answered:
“A. No, sir, the only thing I did notice unusual was a piece of board that traffic was running over in the southbound lane, but I didn’t pay any attention to that.”
Mrs. Babin testified that at approximately four o’clock she did not know whether she was half asleep or not and didn’t know “if the knock or what I heard finished waking me up or what. When we heard it we got up,” and they opened the door and looked out south toward the canal and she saw some flares burning at the canal but how many she didn’t know, nor where they were but she knew some were burning.
Mrs. Ruth Driver lived north of Monte Sano Bayou on the east side of Plank Road. On the night before, February 16, 1956, she drove her car south in the western lane and parked it near the barricade on the north side of the bayou between eight and nine o’clock. She testified that the barricades and flares were there at that time. When asked if she had ever seen the flares before in traveling that road, she stated: “Yes, I had seen them, those lights were always there.” On cross examination she stated that she lived right across from where the accident happened and when asked by counsel whether she could not have driven the road without even observing it as she was so familiar with it, she answered:
“I don’t know. Lights are very obvious to see right in the middle of the road. I can’t say that I couldn’t see them because I did see them and I noticed them.”
Mr. Driver corroborated the testimony of his wife that the car had been parked in front of the barricade in question the night before about nine o’clock. After getting the groceries out of the car he had moved the car and parked it elsewhere. This witness stated positively that the flares and barricade were there and burning at that time. He also testified that he had driven south on the Plank Road on occasions prior to the date of the accident and had seen the barricade and flares and had no trouble or difficulty in seeing them.
Creel testified that he had put the flares on the barricade, which he stated was of the same kind as used on any construction jobs. He also testified that he had passed the scene of the accident at approximately nine o’clock the night before on February 16, 1956 and the flares were all burning at that time. He passed by the next morning at about 10 minutes to eight going to the north end of the job to start picking up all the flares, and when he reached the scene of the accident he said to his helper: “ * * * ‘Shorty’, I says, ‘Somebody went through a barricade there last night.’ * * * ” He didn’t stop at that time as he said he saw no car around as, of course, the car was completely hidden in the deep hole.
The photographs show- a portion of the broken barricade and the tracks of one car that, continued off the end of the pavement and on into the soft dirt up to the pile of dirt which is three or four feet high immediately in front of the excavation or hole. There is no testimony that any other noises were heard during the night then that which was testified to by the residents nearby. There is nothing in the photographs or the testimony to indicate that anyone else struck this barricade other than the car which made the tracks leading to the hole and driven by McCraine. While anything is possible, it is more than unlikely and not probable that a car could have been driven in such a manner as to shatter this barricade and knock two of the flares across to the east side of Plank Road in the ditch without leaving some sign on the pavement or without running off the end of the pavement. There were no signs pointed out in the photographs as being brake marks and no testimony of any witnesses that they *163 heard any brakes applied. Another circumstance which corroborates the fact that McCraine’s car is the car that ran through the barricade is the fact that, immediately after some of the witnesses heard the noise which awakened them or which they heard, being awake at the time, was the sound of cars running over a plank or board immediately after the accident. The noise kept one of the witnesses awake’ and the testimony is positive that it had not been heard prior'to the four A.M. noise. The sound which the witnesses described as a “thud” could also have been that made by a flare which the car struck when it ran into the barricade. The indentation in the hood of the McCraine car as shown in one of the photographs has all the appearances of having been made by one of the flares.
Considering the testimony and the physical facts as shown .in the photographs, the testimony satisfies the requirements of the law for the establishing of a fact by circumstantial evidence in a civil case, even though none of the witnesses heard a sound resembling a crash. There were dents upon the front of the hood and slightly to the top of the hood which most probably were made when the car struck the top of the barricade and a flare, however, these marks could have been made, in some other manner, when the car was falling and turning over on its side in the hole. It is almost impossible to even imagine how another car could have so completely destroyed this barricade and knocked the flares across the highway into the ditch without' leaving definite physical evidénce which could easily be distinguished from the physical evidence or tracks clearly shown'in the photographs as having-been left by the McCraine-driven automobile. If a-car -had struck the barricade head on as apparently the McCraine-car did in order to completely demolish it- and knock some of the flares across the highway it would have gone off the end of the.pavement into the dirt and there would have been two sets of tracks rather than only that óf the McCraine driven automobile. If it had been able to'stop before going off the pavement there would almost certainly have been skid marks for it could not have struck with the force necessary to- destroy the barricade and spatter the flares as shown by the evidence had it been- proceeding slow enough to come to a stop without the application of its brakes before running off the end of the pavement, which was only - ten feet from the barricade. If it be argued that a cár could have seen the barricade in time to swérve and only strike the left hand corner of the barricade and.thus remain on the pavement by proceeding in the left hand lane, then the barricade would have been knocked to the right, whereas the testimony shows that it was slanted and one board knocked into the open southbound lane of traffic and cars running over this board kept one of the witnesses awake after he heard the unusual noise which undoubtedly was the McCraine car when it destroyed the barricade and continued on 79 feet into the excavation.
Counsel for plaintiff cites, on the question of circumstantial evidence, the case of Bickham v. Wax Lumber Co., La.App., 84 So.2d 60, 62, in which it was stated:
“It has been held-by the courts of this state that a plaintiff [defendant] relying upon -circumstantial evidence is required to produce evidence which excludes, with a fair amount of certainty, every other • reasonable hypothesis but the one relied on.”
See also Gomez v. Granberry, La.App., 89 So.2d 454.
The testimony and physical facts in this case exclude with a fair amount of certainty every other reasonable hypothesis other than that McCraine was the one who ran through the barricade and flares which were standing at the time.
The next question for this court to decide is whether the barricade and flares as located ' were adequate warning. The defendant’s employees who were witnesses in the case testified that the barricade and flares were adequate and sufficient, also dis *164 interested witnesses whose testimony has already been discussed testified that the flares and barricade could easily be seen at night. Some of these witnesses had driven on the strip of pavement in question at night.
Mr. Bauer, who was offered as an expert on behalf of plaintiff, testified that this barricade and flares were not adequate, and that they should have had a barricade notification approximately 300 feet back from the end of the pavement and “then move back ISO to 200 feet further and put a diagonal barricade if that lane was open throwing the moving traffic into the lane in operation to get it off of that dead end, which it amounted to with that construction work.” He then stated that after putting up the 300 foot barricade notice, one should be put about 500 feet from the end of the pavement or 200 feet from the 300 foot barricade, and then another barricade at the end of the pavement. As to the type and kind of notifications that should be used he testified:
“The type we have been using and the type I would recommend would be the standard 3Vá to 4 foot A-frame with cross-members, flares at the sign, ‘Form Single Line Traffic’ if that was what it was supposed to do or ‘Road Closed’ or ‘Under Construction’ and that would be on an angle to throw the first car into the opposite lane and the next one would be across at right angles to the road as a warning in case he got by. The last one would 'be right at the— within 10 or 15 feet of wherever it dropped off or whatever it was.”
This witness also testified that the black and white stripes on the board when he saw them were dirty, however, he stated that they had been knocked on the ground. Of course, if only the barricade with no flares had been present, there would have been no question but that this would have been inadequate, regardless of whether the black and white stripes were clean or dirty. This witness testified that flares could be deceptive where it was foggy or rainy, however, it was not foggy or rainy on the night of this accident. Under cross examination the witness went into more detail with regard to how he would have placed barricades and notices to protect the public. He stated that he would have put seven or eight flares on the pavement in front of the barricade but not on top, which would have been placed about 20 feet from the end of the pavement, then 300 feet from the end of the pavement would be another barricade at right angles to the road, in other words, across the road, which would be flared also but only with four or five flares, which he called a “pre-warning.” This barricade would be a lighter barricade than the last one. After the 300 foot barricade, approximately 150 feet away from it he would place one at an angle to throw traffic into the other lane of travel and he would put flares around this barricade, and at the angled barricade he would put some sign notification that the road was under construction such as “Form Single Line,” or “This Lane Not Open for Traffic,” and when asked if he was going to do that why would he put the second one cross ways of the road he answered: “For the simple reason that people driving automobile just run through barricades, Mr. Hardin.” He was then asked: “And you think he might run through that one, that the second one would be more help to him?” and answered: “It might slow him down before he gets to the last one.”
The reasoning of this witness is rather difficult to follow for one can be killed by negligently running into the first flared barricade the same as if he had run through the last one and into the hole. Of course, his chances are better on the flat pavement but the motorist’s actions add up to the same thing, which this witness expressed— negligence in running into any lighted barricade. Following this witness’ reasoning, possibly it would have been better to have completely closed the entire western lane. A negligent person could have been killed with the three barricades in place. That is *165 speculative. Under this witness’ testimony it is logical to deduce that he was of the opinion that one flared barricade was sufficient to warn a motorist but that in order to keep them from running into the hole there should have been three barricades which would possibly prevent a motorist from getting as far as smashing the last barricade. The speed limit upon the Plank Road at the scene of the accident was 35 miles per hour.
Counsel for plaintiff makes the following argument in his brief:
“In determining what duty rests upon the contractor and what constitutes reasonable warnings, our courts have been continuously consistent in hold-in to the effect that the place where the danger exists, the nature of the road, and the general situation and circumstances surrounding it are to be taken into consideration. In this connection, see Smith v. State (Department of Highways) [La.App.], 1 Cir. 1956, 87 So.2d 380; Dowden v. State [La.App.], 2 Cir. 1955, 81 So.2d 48; Reeves v. State [La.App.], 2 Cir. 1955, 80 So.2d 206; Davis v. Department of Highways [La.App.], 2 Cir. 1954, 68 So.2d 263; Preuett v. State [La.App.], 2 Cir. 1953, 62 So.2d 686; Goodwin v. Department of Highways [La.App.], 2 Cir. 1951, 53 So.2d 161; Rosier v. State [La.App.], 2 Cir. 1950, 50 So.2d 31; De Hart v. State [La.App.], 1 Cir. 1950, 46 So.2d 366; Stafford v. Nelson Bros., 1 Cir. 1930 [15 La.App. 51], 130 So. 234.
“The most recent decision dealing with hazards of the type herein presented is contained in the Smith case, 87 So.2d 380, on page 383, which was an appeal from the Nineteenth Judicial District Court, Honorable Jess Johnson, Judge presiding, and Judge Ellis, as the organ of this Court, observed as follows:
“ ‘No hard and fast rule can be laid down as to the type of warning or barricade that should be erected by road contractors or state agencies to warn the public of travel hazards ahead. The warning should be of a size and nature commensurate with the danger ahead. For instance, if a bridge is out, a complete barricade would be indicated. In a case where the road ahead is impassable, or passable only with extreme danger to life, a barricade with appropriate explanatory sign would be in order.’
“And, borrowing from the language of the Reeves case, 80 So.2d 206, 209, the Court continued:
“ ‘While no hard and fast rule can be laid down as to the type of warning or barricade that should be erected or maintained by the highway authorities to warn the public of such hazards, the warnings and means of protection should be of a size and nature commensurate with the danger that lies ahead. For instance, where the pavement ends, such as it did here, with the adjoining surface considerably below the paved surface, a complete barricade should be erected and properly lighted, at appropriate and safe distances from such dangers. Warning and detour signs should have been erected and maintained.’
“The Court concluded in the Smith case, 87 So.2d on page 383, as follows:
“ ‘The duty of the Highway Department (Contractor) in such cases is clear and the above cited authorities are supported by many other cases, both in Louisiana and other jurisdictions, the citation of which would serve no useful purpose herein.’ ”
The cases cited and relied upon by plaintiff are not controlling because the facts are different. In the Smith case, supra, there was nothing across the motorist’s lane of travel, no flares, no lights, and we stated that in such a case a complete barricade should have been erected, meaning with *166 flares, completely across the motorist’s lane of travel which dropped off into a ditch some five feet deep and 12 feet wide. There was a complete barricade in the case at bar some 16 feet in width with ten flares upon it. If there had been no barricade at all there would be no question of liability. The barricade in question in this case was located at approximately 75 to 79 feet from the edge of the hole which, under the weather conditions and the speed limit, would be considered to be at a safe distance for a driver in command of his faculties and keeping a proper lookout. In addition to the above we find a mound of dirt three to four feet high at the end of the paved slab.
In the Dowden case, supra, there was an unguarded torn out bridge at the foot of a hill, which is completely foreign to the facts of this case. In the Dowden case [81 So.2d 54], quoting from the case of Reeves v. State, 80 So.2d 206, we find the following statement:
“While no hard and fast rule can be laid down as to the type of warning or barricade that should be erected or maintained by the highway authorities to warn the public of such hazards, the warnings and means of protection should be of a size and nature commensurate with the danger that lies ahead. For instance, where the pavement ends, such as it did here, with the adjoining surface considerably below the paved surface, a complete barricade should be erected and properly lighted, at appropriate and safe distances from such dangers. Warning and detour signs should have been erected and maintained.”
Also in the Dowden case the Court reviewed the law which is stated in part as follows:
“As was stated in Reeves v. State of Louisiana, La.App., 80 So.2d 206:
“ ‘There is a mandatory statutory duty of the Department of Highways to erect and maintain proper and adequate signs, signals and warning devices necessary for informing, directing, cautioning and warning the traveling public of any unusual situation or dangerous condition on the highways or to its approaches which may impede or obstruct the safety of traffic.’
The aforesaid conditions constitute such obvious and serious obstructions and dangers as are contemplated by the statute referred to, LSA-R.S. 48:345, which, in part, reads as follows:
“ ‘The department shall erect and maintain all signs, signals, or devices necessary for informing, directing, cautioning, and warning the traveling public.’
“Observations made in Reeves v. State of Louisiana, supra, are very appropriate here. There it was stated:
“ ‘The due care therefore owed by highway authorities to motorists requires the posting of notices and signs warning them of dangerous conditions. The general rule is stated in 60 C.J.S. Motor Vehicles § 192, p. 530:
“ ‘ “While the exercise of reasonable care by highway authorities toward motorists may require a placing of signs warning of dangerous conditions, as where there are obstructions or excavations in the way, or the highway terminates abruptly, or a bridge has been destroyed, warning signs need not be maintained at places which do not present an extraordinary condition or unusual hazard, as, for example, at curves of an ordinary character in the highway. Warnings or notices need not be given where the physical facts give sufficient warning of the danger. Where a barrier gives ample and timely warning of the dangerous condition of the road, there is no duty devolving on those in charge of the highway to post notices of the condition of the road some distance therefrom. In de *167 termining what is reasonable warning, the place at which the danger exists, the nature of the road, and the general situation and circumstances surrounding it are to be taken into consideration, as are also the kind of travel and the speed at which vehicles will probably travel on the road.” * * *
“ ‘To the same effect are the decisions in Department of Highways v. Fogleman, 210 La. 375, 27 So.2d 155; Department of Highways v. Jones, La.App., 35 So.2d 828; De Hart v. State, La.App., 46 So.2d 366; Rosier v. State, La.App., 50 So.2d 31; Goodwin v. Department of Highways, La.App., 53 So.2d 161, and Davis v. Department of Highways, La.App., 68 So.2d 263.
******
‘ “The duty to keep the highway in a reasonably safe condition means safe for general or ordinary travel, or use for any lawful and proper purpose, including use for both pedestrians and vehicles, such as bicycles and motor vehicles, * * ’
“See also Preuett v. State, La.App., 62 So.2d 686.
“ ‘The general rule is also well established and recognized in the jurisprudence of this state that a motorist using a public highway has a right to presume and to act upon the presumption that the highway is safe for the usual and ordinary traffic, either in daytime or at night, and that he is not required to anticipate extraordinary danger, impediments or obstructions to which his attention has not been directed.
“ ‘Blashfield’s Cyclopedia of Automobile Law and Practice, Volume 5A, 387, “Highways”, § 3320, states such rule as follows:
“ ‘ “In the absence of notice to the contrary, there are certain assumptions which may be indulged by a motorist as to the condition of the public streets and highways, whether he be traveling by day or night. Among these are: (a) That the way is reasonably safe for travel and free from defects and unlawful obstructions; (b) that those charged with the duty of keeping it so have exercised a proper degree of diligence in so doing; (c) that it will not be obstructed unlawfully or in such a manner as to cause an injury to him while he is in the exercise of due and reasonable care; * * *_»
See also Jacobs v. Jacobs, 141 La. 272, 74 So. 992, L.R.A. 1917F, 253; Kirk v. United Gas Public Service Co., 185 La. 580, 170 So. 17 ”
The rule laid down in the De Hart case applied to a road across which a culvert ran and had been covered with a mound of dirt approximately seven inches above the ground and was unprotected by any warning signs.
In the present case there were some '250 flares along this portion of the Plank Road under construction and it was well known by McCraine to be in the process of widening, and some ten feet from the end of the pavement was a barricade with ten flares on it. In the case of Reeves v. State, 80 So.2d 206, 209, quoting from 60 C.J.S. Motor Vehicles § 192, we find stated:
“Where a barrier gives ample and timely warning of the dangerous condition of the road, there is no duty devolving on those in charge of the highway to post notices of the condition of the road some distance therefrom.”
We are of the opinion that in the present case this flared barricade was adequate in that it gave ample and timely warning of the dangerous condition of the road to .any motorist keeping a proper lookout with his lights on and in good condition, and traveling within the speed limit of 35 miles per hour. It must also be re *168 membered that this one barricade did not stand alone as the only warning on this section of the Plank Road. This dangerous hole was completely surrounded by barricades and flares, and as previously stated McCraine was familiar with the fact that the road was under construction and had passed the particular spot a short time previous to the accident, and all along the road there were some 250 flares which were a constant warning to anyone traveling this section of the Plank Road that it was under construction.
The facts in the Davis case, supra, involved a truck which struck a ridge of wind-rowed dirt and gravel in the center of the highway which was without any warning sign whatever.
Considering the facts and applying the law as quoted and cited from the Reeves case, we are of the opinion that the barricade as constructed with the flares thereon .constituted adequate and sufficient warning as previously stated to every motorist keeping a proper lookout and traveling within the 35 mile speed limit.
The next question is whether or not the defendant was intoxicated and likewise whether he was guilty of contributory negligence. The only testimony in the case is to the effect that he had at most five or six beers and one coca-cola hi-ball with Seagrams V.O. Whiskey, and the District Court definitely concluded that he believed the testimony of the witnesses that Mc-Craine was not, so to speak, intoxicated so as to affect his mental capabilities. While we cannot say that the District Court’s finding was manifestly erroneous, it is a fact that he had been up all night, having started to work at quarter to four the previous afternoon, and it is only reasonable to assume that he was at least a very tired man, but even if he was not intoxicated and was not tired, he was fully aware that this road was under construction and there is no reason in the world why on a clear, dry morning, while traveling 35 miles an hour, he should not have seen the lighted barricade in ample time to have safely pulled into the opposite lane and avoided striking it. According to the physical facts, he did not even see it in time to react so as to apply his brakes. Had he been keeping a proper lookout he was bound to have seen it. Furthermore, there was a string of lights and barricades along the eastern edge of the hole and a barricade and lights on the south end of the section of pavement traveling north, as well as a mound of dirt three or four feet in height between the end of the pavement and the hole. Therefore, we conclude that even if he were not affected by the amount of drinking that he did, it is evident that his faculties were dulled for some reason and his failure to see or heed the lighted barricade constituted the grossest kind of contributory negligence.
A motorist, in order to claim the benefit of certain assumptions as to the condition of public streets and highways, must at the time be exercising due and reasonable care. See Dowden v. State, supra. McCraine in the present case was not exercising due and reasonable care or he could not have failed to have seen the lighted barricade.
There is one other contention which has arisen on the question of contributory negligence. It is suggested that we have violated the very fundamental principle which the Supreme Court set forth in Stansbury v. Mayor and Councilmen of Morgan City, 228 La. 88, 84 So.2d 445, 448, in assuming that McCraine was contribu-torily negligent in running into lighted flares, for in this case the court stated: “ * * * Where there are no eyewitnesses to any act of negligence it is presumed that the decedent acted with ordinary care.” The main error in this contention is that we have assumed that McCraine was contributorily negligent. We have shown by the evidence in this case that he was proven to have been contributorily negli *169 gent. On this particular point in the Stans-bury case the Supreme Court stated:
“Defendants introduced no evidence to show contributory negligence and none was shown. Whenever this defense is pleaded it is incumbent upon the party pleading it to prove it by a preponderance of evidence. Clements v. Louisiana Electric Light Co., 44 La.Ann. 692, 11 So. 51, 16 L.R.A. 43, 32 Am.St.Rep. 348; Layne v. Louisiana Power & Light Co., La.App., 161 So. 29, 35. It was pointed out in the Layne case that when a person is employed in the presence of a known danger, to constitute contributory negligence, it must be shown that he voluntarily and unnecessarily exposed himself to the danger and where there are no eyewitnesses to any act of negligence it is presumed that the decedent acted with ordinary care. The court in the Layne case quoted from Adams v. Iron Cliffs Co., 78 Mich. 271, 44 N.W. 270, 18 Am.St.Rep. 441 the following: ‘The reason for this rule is that life is dear to the normal person, and that he will not willingly do the thing which will extinguish it, but, on the contrary, will exercise due care to preserve it.’ ”
A mere reading of the above quoted statement was that it is only where no evidence to show contributory negligence is introduced and none is shown that decedent is presumed to have acted with ordinary care. The Court reiterated in the above statement that under a plea of contributory negligence it is incumbent upon the party pleading it to prove it by a preponderance of the evidence.
In addition to the above comments on the Stansbury case the court quoted a portion of that which was stated in the Layne case by the Second Circuit Court of Appeal and we think it important to quote the basis for that portion quoted by the Supreme Court from the Layne case, viz. [161 So. 35]:
“The case further held that where there are no eyewitnesses to any acts of negligence on the part of plaintiff, it is presumed that he acted with ordinary care, in the following language:
“ 'In Adams v. Iron Cliffs Company, 78 Mich. 271, 44 N.W. 270, 18 Am.St. Rep. 441, Justice Morse, in speaking for the court, said:
“ ‘ “This brings up squarely the question of contributory negligence in a case where there is no eyewitness of the accident. In such a case, while the rule is not relaxed that the plaintiff must show that his intestate was without fault, yet the presumption, in the absence of any evidence to the contrary, obtains that the deceased used ordinary care and caution in attempting the crossing, and such presumption is sufficient under the rule to permit the plaintiff to recover upon showing negligence in the defendant. McWilliams v. Mills Company, 31 Mich. 274; Mynning v. [Detroit L. & N.] Railroad Company, 59 Mich. 257, 26 N.W. 514; Id., 64 Mich. (93) 102, 31 N.W. 147, 8 Am.St.Rep. 804; Id., 67 Mich. (677) 680, 35 N.W. 811; Kwiotkowski v. [Grand Trunk] Ry. Company, 70 Mich. 549, 38 N.W. 463; [Chicago, R. I. & P.] Railway Company v. Clark, 108 Ill. 113; Teipel v. Hilsendegen, 44 Mich. (461) 462, 7 N.W. 82.” Van Doom v. Heap, 160 Mich. 199, 125 N.W. 11; Richardson v. [Detroit United] Railway Company (176 Mich. 160), 142 N.W. 369.
“ ‘The reason for this rule of law is that life is dear to the normal person, and that he will not willingly do the thing which will extinguish it, but, on the contrary, will exercise due care to preserve it.’ ”
Thus we see that any presumption of innocence in the absence of eye witnesses where contributory negligence has been plead as a defense does not relax the rule *170 that the plaintiff must show that his intestate was without fault, yet the presumption “in the absence of any evidence to the contrary” remains that the deceased used ordinary care. Neither the Stansbury nor Layne cases wherein a presumption of ordinary care was applied are applicable to the case under consideration. We have a case in which a man had been working from quarter to four in the afternoon until quarter to twelve at night, had left his work and gone to three night clubs and had done some drinking though not sufficient, if the evidence is accepted as strictly true, to become intoxicated, and did not leave to return home until almost four A.M. in the morning, and who ran into a four or five foot high barricade with six flares on top and four on the bottom and over a pile or mound of dirt three or four feet high and into an excavation approximately 79 feet from the barricade on a clear night and on a highway on which the legal speed limit was 35 miles per hour and at which point it was located within the main city limits of Baton Rouge. Further, the deceased was well aware of the fact that the highway was under construction as well as anyone else would have been that was traveling the highway, for it had approximately 250 flares located along the three or three and one half mile stretch under the process of being widened. In addition to the barricade on the north end of the pavement this excavation had one on the south end and along the eastern edge so that it was surrounded by flares and barricades.
For the above and foregoing reasons, the judgment of the District Court is reversed, set aside and annulled and judgment is now rendered dismissing plaintiff’s suit at her costs.